REVISED MARCH 20, 2009
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 5, 2009

Charles R. Fulbruge III
Clerk

No. 07-31131

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

STEPHEN MICHAEL LONG

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Louisiana

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

At the heart of this appeal lies the question whether the district court erred reversibly in denying Defendant-Appellant Stephen Michael Long his requested insanity instruction to the jury. In our de novo review of this purely legal question, we must at all times keep as frontlets before our eyes the overarching core distinction of this appeal: It is not a garden-variety fact issue of sufficiency of the evidence to support a jury's finding on insanity; rather, it is the legal issue whether the district court, as gatekeeper and not as factfinder, should have granted the defendant's request to put his affirmative defense of

insanity to the jury in the first place. With this distinction ever present in our minds, we proceed with our non-deferential, de novo review.

Long was charged with thirty-eight counts of threatening to use a weapon of mass destruction, thirty-seven counts of mailing threatening communications, and four counts of transmitting threats by wire, in violation of 18 U.S.C. §§ 875(c), 876, and 2332a(a)(2). These charges arose from mailings that he made to approximately 200 persons in Lafayette, Louisiana and elsewhere, which mailings contained a white powder, bomb threats, and rambling diatribes about politics, child abuse, and terrorism. Long attempted to mount an affirmative defense of legal insanity, but, after he presented his evidence at trial, the district court refused to give an insanity instruction to the jury. In the absence of that instruction, the jury convicted Long on all counts. He timely appealed, claiming that the district court's refusal to give the insanity instruction was reversible error. We address today only Long's entitlement to a jury determination on insanity, not whether a jury would have or should have found him insane. Satisfied that, as a matter of law, Long presented sufficient evidence to entitle him to have the trial court instruct the jury to determine whether Long was legally insane, we reverse his convictions and remand for further consistent proceedings.

## I. FACTS AND PROCEEDINGS

Together, Long and the government adduced the following facts. In April 2002, threatening letters containing a white powder — later identified as harmless baby powder — were received by residents in the Lafayette, Louisiana area and elsewhere. The letters spoke of al Qaeda and bombs planted throughout Lafayette (no bombs were ever found), and also made reference to

Cipro (a drug used to treat anthrax infections) and to The Anarchist Cookbook. Because the attacks of September 11, 2001 ("9/11") and the 2001 anthrax mailings were still fresh in the minds of the public, the letters caused widespread panic in the region.

A few months after the mailings, in June 2002, a local television station received e-mails that contained wording and references similar to the threatening letters. The e-mails were sent from an account linked to Long and included a number of details (such as information about his wife's medical history and his signature using his middle name) that identified Long as the author. The police tracked down Long and used the June e-mails to connect him to the letters mailed in April. After his arrest, Long confessed to sending the letters, expressed surprise that the police had taken so long to find him, and provided a variety of reasons for having sent the letters. He explained that he had written the letters after suffering psychological distress following 9/11 and that he had wanted to, inter alia, test the government's resources, teach people to protect and pay attention to their children, show that criminals frequently go free, and demonstrate that the chaos of 9/11 was easy to create.

Before trial, Long gave notice that he would assert an affirmative defense of insanity. He attempted to prove insanity at trial by offering evidence of his history of mental illness. His mother testified that at age thirteen, Long was institutionalized for six months and diagnosed with a paranoid psychosis. She also testified that once when she walked in on him, he had a gun in his mouth and claimed that he needed to stop "them" from tormenting him. She stated that he claimed that the government communicates through contrails in the sky. She also established that Long had been sexually abused and suffered various illnesses as a child.

Long himself testified that he began having visual hallucinations and hearing voices in October 2001. In December 2001, Long testified that the voices and hallucinations "really got bad" and began to co-occur. He also testified that three or four voices told him to mail the letters to test the weaknesses of "the system" and to "make people aware" of those weaknesses.

Long's mental health expert was Dr. F.T. Friedberg, a clinical psychologist. He testified that Long suffers from an Axis II psychiatric illness, schizotypal personality disorder, under the classification system of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) ("DSM-IV").

On appeal, the government makes several representations about what its expert concluded (including that he also believed that Long suffers from schizotypal personality disorder), but the district court's rejection of the insanity instruction before the government presented its rebuttal prevents our reviewing any testimony from the government's expert.[1] Dr. Friedberg, whose testimony

---

[1] Over fourteen months after this appeal was docketed, the government moved to supplement the record on appeal with the report of its expert — not to correct the record because of an omission, a fact evidenced by the language in the government's motion and the case which the government cited as support, see United States v. Long, 996 F.2d 731, 732 n.4 (5th Cir. 1991) ("A question arose as to whether this court could properly consider the contracts, as they were not formally admitted into evidence. After reviewing the briefs submitted by both parties subsequent to oral argument, we conclude that we may consider the contracts."). (N.B. The government's motion does not claim — nor could it — that this report was properly before the district court for sanity purposes, only that adding the report to the appellate record would allow the "record [to] be complete as to the information available [as distinguished from "before" or "relevant"] to the district judge's [sic] when he refused to give the jury instruction on insanity." The precise same statement could be made about the color of the carpet in the district court's chambers; that does not make it properly part of the record or relevant).

Under our rules, such motions are a single judge matter, and Judge Wiener, with whom Judge DeMoss agreed, denied the motion. Quite contrary to the dissent's protestations, the district record unambiguously reveals that the government's report was not identified, offered,

we do have before us, stated that schizotypal personality disorder is the most severe Axis II illness and causes bizarre ideation, paranoid mentation, and psychotic episodes, during which a patient loses contact with reality. The disease borders on psychosis, but, unlike some Axis I disorders, is not itself a psychosis. It is unclear whether Long told Dr. Friedberg that he heard voices, but Long's uncontradicted testimony is that he did tell the government's expert that he had auditory hallucinations.

---

or received into evidence at trial, the time at which the only issue in this appeal — Long's sanity at the time he committed the offenses — was addressed. The failure to introduce this report in the district court is not surprising, because the only government witness who could authenticate it and provide an opportunity for cross-examination concerning its contents as required by Crawford v. Washington, 541 U.S. 36 (2004), did not testify (Dr. Womack). Further, the government did not provide this court with an original copy of the report, but offered only a copy that it had annotated and redacted.

This dissent claims that Judge Wiener erred in making "evidentiary" rulings, which it claims are for the trial court. The dissent ignores the fact that Long, 996 F.2d at 732 n.4, the case on which the government relied in its motion, would have permitted supplementation of the appellate record with material outside of the district court record on Long's sanity. It is obvious that Crawford overruled sub silentio whatever was left of Long. Further, to the extent that the government asked this court to add to the district court's record, the authenticity of the documents is, of course, relevant. The dissent highlights that Long did not oppose the motion for supplementation, but the dissent misses the point again. Long need not have opposed supplementation of the record, only any reliance on the report for purposes of this court's assessment of the district court's insanity determination (the report may properly bear on Long's competency, and may have been before the district court for competency purposes, although the government nowhere cited the place in the record where the report was admitted for that purpose). Accordingly, Long waived none of the substantive objections to use of the report on the insanity issue; and Judge Wiener declined, in his discretion, to needlessly enlarge the record on appeal with unauthenticated and unadmitted material not relevant to the only issue in this appeal — Long's sanity.

Finally, whatever else might be said, the copy of the report submitted by the government was in its possession for well over a year, yet it waited over fourteen months after this appeal was docketed, over six months after the record on appeal was transmitted to this court, over four months after its last motion to supplement the record, and almost four months after oral argument to move for supplementation. We will not brook this type of sloppiness or gamesmanship, which disrupts the orderly management of our docket. What the government does not introduce below, it may not attempt to slip in here months late.

The government highlights several circumstances surrounding Long's crimes that it claims demonstrate that he was "able to appreciate the nature and quality [and] the wrongfulness of his acts."[2] Long used self-adhesive stamps on his mailings so as not to leave saliva for DNA detection, and he purchased the stamps during busy times at the post office to make it unlikely that he would be remembered. He copied the letters at Kinko's, threw away the top and bottom copies so as not to leave fingerprints, and stuffed the envelopes using gloves. He mailed the letters from various post offices to cover his tracks further. And he burned down his own house to destroy evidence of his crimes. The government contends that, in combination, these actions and explanations, many of which are known only because Long revealed them, indicate that he knew what he was doing and knew that it was wrong.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's refusal to provide a jury instruction on insanity.[3] "The application of the less deferential standard of review . . . makes sense in light of reduced deference afforded to rulings that take decisions from the jury."[4]

### B. Merits

Congress has provided for an affirmative defense of insanity to criminal prosecutions, codified in 18 U.S.C. § 17, which reads:

---

[2] 18 U.S.C. § 17(a) (2006).

[3] United States v. Dixon, 185 F.3d 393, 403 (5th Cir. 1999).

[4] Id.

(a) Affirmative defense.–It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.  Mental disease or defect does not otherwise constitute a defense.
(b) Burden of proof.–The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

"A jury instruction on the insanity defense is required 'when the evidence would allow a reasonable jury to find that insanity has been shown with convincing clarity.'"[5]  The defendant need not "eliminate ambiguity from his proof or . . . instill certainty in the minds of the jurors but rather [is] only require[d]" to produce evidence that "would permit the jury to find a high probability that . . . [he] was insane."[6]  In United States v. Dixon, our most complete treatment of these issues to date, we said that a court may "withhold the insanity instruction if it concludes that the relationship between a defendant's mental illness history and his criminal conduct has not been explained or examined in any meaningful way," but that we "must construe the evidence, and all inferences, . . . most favorabl[y] to the defendant."[7]

As a preliminary matter, the government appears to contend that our previous formulation of the defendant's burden of proof — "convincing clarity" — somehow imposes a higher standard than that of the clear-and-convincing-evidence standard.  We are not impressed by this attempt at dictional

---

[5]  United States v. Eff, 524 F.3d 712, 717 (5th Cir. 2008) (quoting Dixon, 185 F.3d at 404).

[6]  Id. (internal quotation marks omitted).

[7]  185 F.3d at 407 (emphasis added).

distinctions between Dixon and § 17(b).[8] The government does not distinguish "convincing clarity" from "clear and convincing evidence" other than to intimate conclusionally that "convincing clarity" is a more difficult burden to satisfy. It offers no basis for such a distinction between the two standards, undoubtedly because none exists. Congress in § 17(b) and this court in Dixon require that a district court instruct the jury on an insanity defense whenever a reasonable juror could conclude, on the basis of clear and convincing evidence, that the defendant committed the acts constituting the offense because he was insane at the time. Put another way, the trial court must determine whether a reasonable juror could conclude that (1) there is a high probability that the defendant (2) was unable to appreciate the nature and quality or the wrongfulness of his acts (3) at the time he committed the acts constituting the offense (4) as a result of a mental disease or defect which is (5) severe.[9] When we administer this test de novo, we conclude that a jury could so determine in Long's case.

The government does not assert that Long failed to produce sufficient evidence of a mental disease or defect. Instead, it bases its position almost entirely on the second and fifth prongs of our test, insisting that, because Long was diagnosed with a DSM-IV Axis II disorder, rather than an Axis I disorder, no reasonable juror could conclude that his mental disease or defect was "severe"; and that Long's efforts to evade detection compel the conclusion that

---

[8] Id. 403-04. The government's confusion appears to arise from Dixon's repudiation of the old rule from Blake v. United States, 407 F.2d 908, 911 (5th Cir. 1969) (en banc). Blake required district courts to give an insanity instruction if there was even "slight evidence" in support of the defendant's claimed insanity. 407 F.2d at 911. We recognized in Dixon that Congress repudiated our Blake approach when it passed the current version of 18 U.S.C. § 17. 185 F.3d at 403-04. But, our opinion in Dixon did no more than that.

[9] See 18 U.S.C. § 17 (2006).

8

he was able to appreciate the wrongfulness and the nature and quality of his acts. We are satisfied that both of these arguments are without merit.

Regarding the government's contention that Long's schizotypal personality disorder is not severe, we note first that courts have jealously guarded their prerogative to define the legal meaning of insanity and have protectively guarded the factual prerogative of the jury to determine whether the evidence satisfies that legal definition. Within this dichotomy, we have permitted experts to opine whether a mental disease or defect is or is not severe,[10] but the admissibility of such evidence as an aid to determination should not be confused with who has the ultimate responsibility for defining a legal concept.[11] A defendant may be severely mentally ill in an expert's clinical opinion, yet not be severely mentally ill according to legal understanding. The obverse has also been recognized.[12]

A contrary approach — one that treats a particular diagnostic category as necessary or sufficient for a "severity" finding — would improperly surrender to mental health experts the ultimate responsibility of adjudicating criminal culpability and just as improperly would take that decision away from the court and jury, causing the insanity defense to again rise or fall solely on the basis of a clinical diagnosis. As support for this approach to severity, the government cites Dixon, but that case did not state that an expert testified at trial that the

---

[10] Dixon, 185 F.3d at 400.

[11] We need not address whether some professional body or some mental health expert must conclude that a particular set of behaviors or symptoms constitutes a "mental disease or defect" because the government does not contest that Long suffers from some type of mental disease or defect.

[12] See Dixon, 185 F.3d at 400, 405-07.

defendant's behavior at the time he committed the crimes could be called "psychotic." In fact, only the government's expert testified at Dixon's trial, and, not surprisingly, he testified that he did not believe that the defendant suffered from a severe mental illness that prevented him from appreciating the nature, quality, and wrongfulness of his acts.[13] In Dixon, we focused on the presence of delusions and hallucinations, not on the word "psychotic."

The testimony that in Dixon we said a defendant should introduce cuts even harder against such a talismanic approach. The appropriate testimony, we said, should "describe the characteristics of [the defendant's] mental illnesses and the effect of such illnesses on his ability to appreciate wrongdoing."[14] This instruction focuses on the content of the diagnosis, not its label.

The approach of the government to the severity question leads to the "confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact."[15] Both Congress and the American Psychiatric Association recognized that this is an intolerable situation:

---

[13] Id. at 402, 406.

[14] Id. at 406.

[15] S. REP. NO. 98-225, at 230 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3412 (reporting on the proposed law now codified at 18 U.S.C. § 17). As noted above, we have held that the existence of a severe mental disease or defect is not an ultimate question for purposes of Federal Rule of Evidence 704(b). See Dixon, 185 F.3d at 400. Whether expert evidence is admissible on this question does not, however, determine whether a particular diagnosis by an expert is either necessary or sufficient to satisfy the requirements of § 17. As we demonstrate, such a conclusion is contrary to the text and purpose of § 17. Requiring experts to bandy about conclusional descriptions of the severity of a mental illness, rather than simply permitting such testimony as an aid to the jury, would raise the same issues that led Congress to bar such testimony on the appreciation element. Whether or not the question of severity is an ultimate legal conclusion, it is still a necessary element of the defense.

"[I]t is clear that psychiatrists are experts in medicine, not the law. . . . [T]he psychiatrist's first obligation and expertise in the courtroom is to 'do psychiatry,' i.e., to present medical information and opinion about the defendant's mental state and motivation and to explain in detail the reason for his medical-psychiatric conclusions. When, however, 'ultimate issue' questions are formulated by the law . . . . [the psychiatrist] no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the probable relationship between medical concepts and legal or moral constructs such as free will. . . ." Determining whether a criminal defendant was legally insane is a matter for legal fact-finders, not for experts.[16]

From these principles, it is indisputable that the nomenclature used by, and the ultimate diagnosis of, a mental health expert is analytically irrelevant (except as shorthand) to the determination of severity under § 17.[17] The content, symptomatology, and description of the clinical disorder — in short, the "mental state and motivation" — of the defendant are what we consider when we look to the legal effect of an expert's diagnosis. The text and legislative history of § 17 evince no intention to turn a disease's DSM-IV axial stratification or classification as a psychosis into a necessary but insufficient condition for a jury's determination of severity. This truism accords with our cases as well. For example (and recognized by the government in its briefing), we have assumed

---

[16] S. REP. NO. 98-225, at 231, 1984 U.S.C.C.A.N. at 3413 (quoting AMERICAN PSYCHIATRIC ASSOCIATION, STATEMENT ON THE INSANITY DEFENSE 18-19 (1982)).

[17] Some diagnoses may not require that a defendant possess the mental state and motivation that are necessary for a legal finding of insanity; other diagnoses may even exclude such mental states and motivations. We could then say that those diagnoses do not qualify as severe. It is important to realize, however, that it is not the fact of the diagnosis itself that is important; rather, we focus on what such a diagnosis says about the mental state and motivation of the defendant at the time the acts are committed.

arguendo that Klinefelter's Syndrome is a severe mental disease or defect, even though that diagnosis appears nowhere in the DSM-IV and is not a psychosis.[18]

The foregoing establishes that courts, not mental health experts, define the meaning of "severe," and that the jury (ordinarily) decides whether the evidence adduced to satisfy that legal definition is clear and convincing. And, for the legal definition of "severe," we have several sources from which to draw. For example, we have held that a mental disease or defect is severe when it is characterized by a mental state that involves hallucinations or delusions.[19] We have assumed arguendo that a mental state characterized by "childlike decisions or magical thinking" is severe.[20]

We also have explicit guidance from the legislative history of § 17 about which mental diseases and defects Congress meant to exclude when it added the "severe" requirement. Congress intended to exclude non-psychotic behavioral disorders, such as "inadequate personality, immature personality, or a pattern of antisocial tendencies," because it wished to eliminate the cognitive-volitional test of the Model Penal Code.[21]

We need not today further explore the limits of "severe," because the manifestation of Long's mental disease — schizotypal personality disorder — at the times that he acted fits comfortably within Dixon's interpretation of § 17. We reach that conclusion on the basis of the diagnostic criteria of schizotypal

---

[18] See United States v. Eff, 524 F.3d 712, 718 (5th Cir. 2008).

[19] Dixon, 185 F.3d at 406.

[20] Eff, 524 F.3d at 715, 718 (internal quotation marks omitted).

[21] S. REP. NO. 98-225, at 225, 229, 1984 U.S.C.C.A.N. at 3407, 3411 (internal quotation marks omitted).

personality disorder[22] and the testimony of Dr. Friedberg, Long's mother, and Long himself. To be clear, we do not look to the diagnostic classification or axial stratification of schizotypal personality disorder standing alone, but view it as evidence of what a reasonable juror could conclude was Long's mental state and motivation at the times he committed the acts constituting the offenses.

According to accepted diagnostic criteria, schizotypal personality disorder is characterized by

> a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior. . . .
> 
> Individuals with Schizotypal Personality Disorder often have ideas of reference (i.e., incorrect interpretations of casual incidents and external events as having a particular and unusual meaning specifically for the person) [but not delusions of reference]. . . . They may feel that they have special powers to sense events before they happen or to read others' thoughts. They may believe that they have

---

[22] We take judicial notice of these as the DSM-IV's authoritative nature makes the criteria "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). In any event, Dr. Friedberg testified at trial to the operative elements of the definition, e.g., the bizarre and irrational thinking and episodic occurrences of psychosis that characterize the disorder. We have made reference to the complete diagnostic criteria to illustrate the background of Dr. Friedberg's testimony and to show its concordance with an authoritative exposition of the illness. We do not use the DSM-IV's acknowledgment of psychotic episodes in persons afflicted with Long's disorder as evidence that Long must have been suffering from a psychosis at the times he committed his crimes. That would be nonsense and is unnecessary anyhow. But, on a hypothetical inquiry into what a reasonable juror might conclude, the fact that Dr. Friedberg testified that psychotic episodes (the positive symptoms of which include hallucinations and delusions, see generally AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 297-343 (4th ed. text revision, 2000) [hereinafter DSM-IV]) may occur during the course of Long's illness lends support for Long's testimony that he experienced hallucinations and delusions at the times he acted. That is, Dr. Friedberg's testimony is expert evidence that explains Long's testimony and the link between Long's illness and his acts in some (i.e., any) meaningful way. In turn, the DSM-IV is support for Dr. Friedberg's testimony and evidence of which we take notice.

magical control over others . . . (e.g., believing that their spouse's taking the dog out for a walk is the direct result of thinking an hour earlier it should be done) or . . . (e.g., walking past a specific object three times to avoid a certain harmful outcome). Perceptual alterations may be present (e.g., sensing that another person is present or heaving a voice murmuring his or her name).

. . . .

. . . Particularly in response to stress, individuals with this disorder may experience transient psychotic episodes . . . .[23]

Dr. Friedberg testified that schizotypal personality disorder is "the most severe type of personality disorder, which is associated with bizarre thinking and paranoid mentation."[24] He also testified that the disorder borders on psychosis and involves periods of psychosis, during which a patient loses contact with reality and exhibits psychotic beliefs. He testified that Long in particular suffered from "episodic psychosis where he basically lost contact with reality" and that "delusions or hallucinations [were] kind of primary symptoms in his case."

Long's mother testified that he had been hospitalized at thirteen for psychotic mentation and that his mental condition deteriorated during the relevant time period in response to the stress of 9/11. She also testified that his physical health deteriorated as well. She described Long's lengthy history of

---

[23] DSM-IV, supra note 22, at 697-98 (emphasis added). A diagnosis requires that five or more of the following criteria be present: "ideas of reference . . .[,] odd beliefs or magical thinking that influences behavior and is inconsistent with subcultural norms . . .[,] unusual perceptual experiences, including bodily illusions[,] odd thinking and speech . . .[,] suspiciousness or paranoid ideation, inappropriate or constricted affect . . .[,] behavior or appearance that is odd, eccentric, or peculiar[,] lack of close friends . . .[, and] excessive social anxiety . . . ." Id. at 701.

[24] (emphasis added). As noted above, there appears to be no dispute that Long suffers from schizotypal personality disorder. We focus here on the severity of that disease.

mental illness and bizarre thoughts relating to national security. For example, she testified that he had "predicted" 9/11 and that he thought after 9/11 happened that "it was left up to him to stop the bad people."

Long himself testified that he heard voices, and, contrary to the government's characterization, also testified that he sent the subject letters and e-mails because "[y]ou know, these are the voices I was hearing. Make people aware." At one point, defense counsel asked, "And while you were creating the E-mail, were there voices?" Long answered: "Yes; oh yes." At another point, defense counsel asked Long, "And what would [the voices] tell you? Would they instruct you, or were they just commenting?" Long replied, "Like commenting, and then I would make an argument back." When asked why he felt like he had to commit the subject offenses, Long testified that it was "[j]ust like hearing a voice saying that this is what you need to do." He testified that he heard voices arguing about his acts during the relevant times and telling him that it was his "job to test the system to find the weaknesses." He also testified that he started to experience visual hallucinations of dark, evil eyes looking at him several months before he committed the offenses.

At a minimum, the foregoing confirms that Long produced evidence that would allow a reasonable juror to conclude that it was clear and convincing and that, on the strength of such evidence, he suffered from delusions and hallucinations at the times of his offenses. Such evidence qualifies as sufficient evidence of severity under Dixon.[25]

---

[25] We address the timing, causation, and appreciation issues — was there evidence from which a reasonable juror could conclude that Long's severe mental illness caused him to be unable to appreciate the nature, quality, or wrongfulness of his actions at the times that he acted? — below. On the severity question, any distinction between hallucinatory voices that instruct and those that simply comment is immaterial. The presence of the hallucinations

The government also attempts to distinguish Dixon in a number of other ways, although whether these distinctions address the severity, the timing, the causation, or the appreciation elements of the insanity test is unclear from its briefing. It urges that, unlike in Dixon, (1) there is less evidence that Long's illness is of longstanding duration, (2) Long was not diagnosed shortly before and again shortly after he committed the crimes, (3) Long was not medicated for his illness by the government during his institutionalization after the crimes, (4) Long was able to hold down a job, (5) Long did not report hearing voices to anyone, and (6) his illness is not characterized by auditory hallucinations.[26] We dispose of these contentions in turn.[27]

Long's institutionalization at age thirteen with a paranoid psychosis indicates that his mental disease is not of a recent vintage. In any event, there is no magic amount of time that a defendant must have suffered from a mental

themselves is evidence of severe (and psychotic) mental disease or defect. As confirmed by Dr. Friedberg, Long also exhibited delusions, believing that he had a special duty and special ability to keep the nation safe from terrorism and to instruct parents to care for their children.

[26] The government also claims that, unlike in Dixon, Long did not exhibit a severe break with reality. That is inconsistent with the testimony of Dr. Friedberg that Long's disease was characterized, at least during its psychotic episodes, by delusions and hallucinations. We are required to treat that unrebutted testimony as true in the type of review that we conduct today. See United States v. Dixon, 185 F.3d 393, 404 (5th Cir. 1999).

[27] The dissent restates these contentions as support for its conclusion that Long did not sufficiently demonstrate that he was unable to appreciate the nature and quality or the wrongfulness of his actions at the time he committed the offenses. As we explain below, to adopt the government's arguments would require us to accept evidence that need not be probative of Long's sanity as sufficient to conclude that no reasonable juror could clearly and convincingly believe Long's affirmative case for insanity. If the evidence the government offers cuts either way (or no way), the dissent does not explain why or how a mixture of marginally and non-probative evidence can do what each piece of evidence standing alone clearly cannot — preclude any reasonable juror from believing Long's affirmative case for insanity. As we emphasized at the outside of this opinion, this case does not involve a review of the sufficiency of a jury finding that Long was not insane, which is an entirely different inquiry.

disease or defect before a jury may conclude that it is severe. All things have a beginning, and we will not deprive recently insane defendants of the benefit of the defense simply because they first became ill relatively recently.

For the same reason, and as further support for this conclusion, an illness need not be diagnosed shortly before or shortly after the crime for there to be sufficient evidence of severity. The fortuitousness of a defendant's access to mental healthcare professionals — who are, after all, required for a diagnosis — is irrelevant to the legal question of evidentiary sufficiency. We will not deprive those insane defendants who had no access to care (either immediately before or after the crime) of the benefit of the defense. A contrary rule would again allow the defense to rise or fall based on diagnoses alone. This is not to say that, although a disease or defect need not be diagnosed at a particular time, it must not be present at the time the offense was committed.[28]

The government's notion that a mental disease or defect must require medication or prevent a defendant from holding down a job before it can be considered severe is also baseless. We will not deny the insanity defense based on the vicissitudes of psychopharmacological research or idiosyncratic hiring decisions. The government does not contest that Long suffers from a mental disease or defect, so the decision by the government not to treat Long with medication during his post-arrest institutionalization cannot be probative. If the government had contested the existence of a mental disease or defect itself, the fact that a psychiatrist did not see fit to prescribe Long medication might be

---

[28] See 18 U.S.C. § 17(a) (2006) ("It is an affirmative defense to a prosecution . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." (emphases added)).

weakly probative. Inasmuch as Long is unquestionably mentally ill, or, in the words of the government, "suffers from a mental disease, a serious personality disorder" and "severe emotional difficulties" that are "associated with bizarre thinking[,] . . . paranoid mentation . . . [and] a breakdown in normal thinking processes," we are left with only two explanations for the failure of the government to medicate Long during his hospitalization: (1) There is no effective treatment for Long's disorder, or (2) there is an effective treatment, but the government denied it to him. We would never suggest that the government would knowingly deny a patient an effective treatment; we note only that the point is irrelevant because neither possible explanation is probative of severity, given the uncontested evidence that Long has, at the very least, a non-trivial mental disease.

Long's intermittent ability to hold down employment for several months at a time is some evidence of the severity of the course of his illness, but limited evidence of its severity at the exact times that he committed the acts constituting the offenses. Given that schizotypal personality disorder is associated with brief psychotic episodes, and that Long testified that he heard voices during the commission of the acts that constitute the subject offenses, he has not failed to present sufficient evidence of a severe mental disease or defect for this reason either.

The government last claims that Long failed to describe sufficiently to the mental health experts who examined him the voices that he heard. We decline to create a rule that, to preserve his right to adduce evidence of his disease or defect at trial, a defendant must have reported the entirety of his symptoms in minute detail to a mental health expert before trial. Even were we so inclined, Dr. Friedberg explained at trial that individuals with a mental illness involving

paranoia may be unwilling or unable to trust mental health professionals. As such, he offered evidence why Long — whose disorder includes paranoid features — would not have reported his most extreme symptoms to a mental health professional. Dr. Friedberg's interpretation supports Long's argument that he suffers from a severe disorder as much as the government's interpretation detracts from it.

In any event, Long testified at trial that he had told the government's expert that he heard voices, and the government did not rebut this testimony; instead, it moved to deny Long the insanity instruction before it presented its rebuttal. To recap, Dr. Friedberg testified that the psychotic episodes of Long's illness are primarily characterized by "delusions and hallucinations," and Long's mother testified that when she found him with a gun in his mouth because he wanted "them" to stop tormenting him, she assumed that Long was referring to "the voices." On this level of review, we "construe the evidence most favorably to the defendant."[29] Long presented evidence (even though it was not necessary) that, construed in the light most favorable to him, demonstrates that others knew of his hallucinations before trial.

The foregoing establishes to our satisfaction that Long was entitled to a jury determination about the severity of his mental disease or defect. We concede that, after hearing it all — including the government's rebuttal should it decide to present one — a jury very well might conclude that Long has not proved the requisite severity, by clear and convincing evidence, to be found not guilty by reason of insanity. At this juncture, however, we cannot say that all reasonable jurors must so conclude.

---

[29] Dixon, 185 F.3d at 404.

The putative existence of a severe mental disease or defect does not, however, end our inquiry. Long must also demonstrate that a reasonable juror could believe, with a high degree of probability, that, because of Long's severe mental disease or defect, he was unable to appreciate the nature and quality or the wrongfulness (when he acted) of the acts constituting the offenses.[30] The government points to the various steps that Long took to avoid detection as evidence that Long fails the appreciation element of § 17. It also notes that Long testified that he sent the letters for the purpose of testing the government and showing that "people can commit crimes and not get caught." The government emphasizes that Long expressed surprise after his arrest that it took the police as long as it did to catch him.

Again, the jury might well conclude in the end that Long knew the nature and quality and the wrongfulness of his acts, but a reasonable juror could just

---

[30] 18 U.S.C. § 17; see Dixon, 185 F.3d at 403-05. Lest there be any doubt instilled by the dissent's conclusion that we have "conflated" the severity and the timing, causation, and appreciation inquiries, let us point out that this section addresses the latter three inquiries, while we addressed the severity issue above. Of course, we discussed the timing inquiry as part of our severity analysis because a severe mental illness must be present at the time of the commission of the offenses (only then can it cause the defendant to be unable to appreciate the nature, quality, or wrongfulness of his actions). So, we are in full agreement with United States v. Denny-Shaffer, 2 F.3d 999 (10th Cir. 1993), a case in which the Tenth Circuit required that the insanity instruction be given and which correctly noted that severity and timing, causation, and appreciation are separate inquiries, but never disputed that the disease must be present at the time of the commission of the offenses. We also note, however, that the analytic distinctiveness of the inquiries does not mean that evidence of a severe disorder of longstanding duration does not offer something probative on the other questions. It is obvious that diagnosis with a longstanding, severe disease renders it more likely that the disease was present at the time of the commission of the offenses than diagnosis with a brief or reactive disorder, or a disease that does not impair thinking and perception as schizotypal personality disorder does (such as post-traumatic stress disorder's continuous features, addressed in United States v. Whitehead, 896 F.2d 432, 433-36 (9th Cir. 1990). Testimony in Whitehead established that the symptoms of that disorder, at least as related to wrongfulness, at most affected volition and mood).

as well conclude, based on clear and convincing evidence, that Long did not know that his acts were wrong because of the delusional beliefs and hallucinations from which he suffered during his psychotic episodes (for example, when he sent the letters and e-mails). Long testified that he needed to test the government, to expose its weaknesses, and to demonstrate how easily chaos similar to that of 9/11 could be wrought because he wanted the government to better guard against terror. He testified that he wanted to alert parents to take better care of their children and to teach people the value of standing up and addressing wrongs.

Even though Long expressed a certainty that he would be persecuted (and prosecuted) for his acts — which feeling of persecution was of longstanding duration according to his statement after arrest — the motivations Long gave for his acts are not criminal or wrongful per se. That Long characterized his motivations in the above ways, and did so consistent with his mother's testimony about the ideational content of his illness over a period of time, would allow a reasonable juror to conclude, by clear and convincing evidence, that Long was at least unable to appreciate the wrongfulness of his actions. Long's effort to effectuate his psychotic intentions would have been all the more quixotic had he not taken steps to cover his tracks, or had he not expected that the criminal justice system would eventually catch him. A test of the government's weaknesses or an effort to demonstrate the ease with which the chaos of 9/11 could be reproduced would be useless if the crime were so obviously a hoax, or the criminal so easily stopped, that no meaningful test or potential for chaos existed. The insanity defense is not limited to defendants who, because of their illnesses, are completely ineffectual in pursuing their bizarre intentions.

Long also linked his delusional belief that his actions were for the "betterment of mankind or God" to the hallucinations he experienced while preparing and sending the communications at issue. He testified that he felt he had to mail the letters because he experienced a sensation "[j]ust like hearing a voice saying that this is what you need to do." In any event, whether or not Long's hallucinations were linked to his delusional beliefs, the very existence of the delusional belief that he had to terrorize hundreds or even thousands of persons for the "betterment of mankind or God" is sufficient to demonstrate that his inability to appreciate the wrongfulness or the nature and quality of his actions flowed from his illness.[31]

Moreover, in Dixon we reversed the district court's failure to instruct the jury on insanity despite the fact that Dixon — like Long — took a number of measures to avoid detection, such as initially hiding his gun, coaching the kidnapping victim to lie, hurrying to avoid the police, covering the victim's uniform with a jacket to make her harder to identify, taping the victim's eyes shut with duct tape and driving around in circles so that she would not learn where he lived, and expressing concern that the victim not be able to identify him based on the objects in his room.[32] Dixon "talked repeatedly about how he was proud to be getting away with it and that he would not be caught."[33] None of this deterred us from concluding that, based on expert testimony about Dixon's delusions, a reasonable juror could have concluded by clear and

---

[31] Of course, individuals who believe this but do not suffer from a severe mental disease or defect do not qualify for the defense. Because this delusion (not mere belief) flows from Long's illness, it is probative of Long's appreciation of the wrongfulness of his acts.

[32] Dixon, 185 F.3d at 395-96.

[33] Id. at 396.

convincing evidence that Dixon was unable to appreciate the wrongfulness of his actions. Neither do Long's efforts to enhance the realism of his faux-terror attack detract from the sufficiency of the evidence he produced about his mental state and its relationship to the acts that constitute the offenses with which he was charged.

Whatever else, even standing alone Dr. Friedberg's testimony that Long's illness was characterized by a loss of contact with reality would have sufficiently elaborated, i.e., "explained . . . in any meaningful way,"[34] a link between that illness and Long's ability to appreciate the nature and quality and the wrongfulness of his actions.[35] The fact that Dixon found a hostile witness's account of the defendant's description of his mental state and motivation sufficient only buttresses this conclusion. Unlike the only expert to testify in Dixon — the prosecution's expert — Long's defense expert, Dr. Friedberg, apparently did believe Long's account; and Long himself provided extensive and detailed information about his delusional beliefs. Dr. Friedberg testified that Long lost contact with reality and that the primary symptoms of Long's "case" were delusions and hallucinations. He also testified that these features of Long's illness directly affected Long's ability to appreciate the effect of his actions on

---

[34] Id. at 407 (emphasis added).

[35] See United States v. Owens, 854 F.2d 432, 436 (11th Cir. 1988) (The defendant's "expert witness[] testified that she diagnosed [the defendant] as a 'psychotic' who would lose touch with reality. Viewing the evidence in the light most favorable to the defendant, [the defendant] presented enough evidence to require an instruction pursuant to 18 U.S.C. § 17."). In Owens, the defendant "fluctuated in and out of touch with reality" and "at times, would lose all contact with reality" according to his expert. Id. at 433-34 (emphasis added). The Eleventh Circuit required no more evidence than that, e.g., specific testimony from an expert or the defendant himself that he was out of touch with reality at the time he acted, to be satisfied that there existed a jury question on the defendant's sanity at the time he committed the crimes. Whether we would go so far, we need not on the facts before us.

others. Long and his mother, in addition to Dr. Friedberg, tied the ideational content of his delusions and hallucinations to his actions. Only if hearsay testimony by a witness who does not believe it is to be preferred could the government's reading of Dixon be correct.

The dissent, if not the government, appears willing to concede that if Long offered expert evidence that he experienced a psychotic episode during the commission of the offenses, he qualifies for an insanity instruction, whether he was diagnosed with an Axis II or with an Axis I disorder. We have explained that the use of the label "psychotic" by an expert is unnecessary, and we explore whether even the symptoms of a psychosis are necessary below. Even if we are wrong on those counts, Dr. Friedberg did provide enough evidence for a reasonable juror to conclude that Long was clinically psychotic at the times he acted. Dr. Friedberg testified:

> We say that this is the kind of borderline that [Long] can move over to psychotic kinds of things and psychotic beliefs, irrational bizarre thinking, and he basically has this general mentation throughout his life with periods of what is called episodic psychosis where he basically lost contact with reality.

Counsel for Long then asked: "That's what we would call a psychotic episode in your field?" Dr. Friedberg replied: "Yes. We talk about, you know, delusions or hallucinations as kind of primary symptoms in his case. Delusional thinking and bizarre thinking is what is generally characterized in psychotic disorders." (emphases added). Counsel for Long later asked: "And in your diagnosis, were you able to confirm or validate that [Long] has breaks from reality?" Dr. Friedberg replied: "Yes. I think it is characterized a lot by, you can see not only in his writings [which were part of the mailings] and in conversations in terms of a breakdown in normal thinking processes." Tying the testimony that Long's

24

writings evidence a break with reality to a clinical definition of psychosis, Dr. Friedberg later opined that "[p]sychosis is a kind of loss of contact with reality." Even without Long's own testimony, which is overwhelming evidence of a psychotic mental state at the times of the offenses when considered in light of the background offered by Dr. Friedberg, the expert testimony itself is sufficient evidence for a reasonable juror to conclude that Long was psychotic at the times he acted. In light of this discussion, it is apparent why the dissent's assertion that "Long has not demonstrated with 'convincing clarity' that he was experiencing psychosis that would prevent him from distinguishing right from wrong at the time he committed the offense" is wrong, even if we were erroneously to conclude that Dixon permits only expert testimony to be considered on this question.[36] We have demonstrated that the dissent's conclusion is both an inaccurate statement of the law (Long need not have demonstrated this fact; he was only required to provide sufficient evidence to allow a reasonable juror to infer it) and inaccurate as a factual matter (Dr. Friedberg did offer testimony about the mental state evidenced by Long's writings, which were part of the mailings that constituted the offenses, in

---

[36] Some expert testimony may be required, but Dixon nowhere purported to limit the evidence a court or jury may consider to only the expert evidence adduced. Further, United States v. Keen, 96 F.3d 425, 430-31 (9th Cir. 1996), is not to the contrary — no expert testified at all in that case, but even then the court did not base its opinion on that fact. See id. at 430 ("The district court preempted Keen's use of the insanity defense because Keen had nothing more to offer in support of the defense than his own testimony and that of his family. In this regard, the district court seemingly based its ruling on the ground that lay testimony is categorically insufficient to demonstrate insanity with convincing clarity. . . . Without reaching the question of whether lay opinion alone can ever support a finding of insanity, we can safely state that the record ultimately supports the district court's decision here. . . . [a]s it appears that Keen's counsel sought to do little more than establish that Keen suffered from a mental disease or defect as opposed to establishing the effect that this condition had upon his ability to appreciate the nature of his actions . . . .").

addition to the primary features — delusions and hallucinations — that characterized Long's "case").

Obviously, neither Dr. Friedberg nor any other expert examined Long during the commission of the crimes and, in any event, would have been prevented under Federal Rule of Evidence 704(b) from offering a direct assessment of Long's ability to appreciate the nature, quality, and wrongfulness of his acts at the times he committed them.[37] This necessitates some degree of inference based on the characteristics of Long's illness at the time that he was examined and Long's own report of his mental state and motivation at the times that he acted. In an effort to avoid such inferences, the dissent equates the appreciation element of § 17 with an expert's testimony that the defendant was psychotic at the time he committed the offense.

When that obfuscated redefinition is exposed, it should be clear how the dissent's approach ignores Rule 704(b), which prohibits expert testimony about an ultimate legal issue with respect to the mental state of a defendant. Redefining the appreciation element as a psychosis element (even if only for this case), and then mandating expert testimony about the existence vel non of a psychosis requires precisely that type of prohibited testimony.

---

[37] The dissent misunderstands our point. Of course Dr. Friedberg could have testified that Long's behavior at the time he committed the offenses was consistent with delusions or hallucinations — in fact, he did just that when he characterized Long's writings thusly. If, however, Dr. Friedberg was not present when Long acted and could not testify that Long was unable to appreciate the nature, quality, or wrongfulness of his acts at the times of the offenses (and quite obviously Federal Rule of Evidence 704(b) precludes such testimony), then there must always be an inferential leap made by the jury (or court) about the defendant's mental state at the times that he acted — a leap based on descriptions (expert and, if the defendant offers them as well, lay) and conclusions made after the fact.

If the dissent's reasoning were taken to its logical conclusion, we would also need to require the presence of a defense psychiatrist at the times the offenses were committed — something Congress surely did not intend to require — to completely avoid inferences based on a defendant's self report (either during a subsequent psychiatric examination or during trial). Yet surely a bank robber who claims God told him to do it does not need the teller at the next window over to be trained as a psychiatrist to be entitled to a jury instruction on insanity.

Even were we to assume that no expert offered sufficient evidence that Long labored under delusions and hallucinations at the times he acted (for Long himself surely did), and even if we were to conclude that no expert testimony labeled Long's delusional and hallucinatory episodes "psychotic" (and that such testimony is required), we could not simply end our discussion there. The dissent, however, does precisely that. It simply disagrees with our conclusion that there is sufficient evidence that Long was experiencing a psychotic episode at the times of his crimes and then uses that conclusion to state that Long does not qualify for an insanity instruction. Yet, like the government, the dissent does not dispute that Long suffered from schizotypal personality disorder at the relevant times. By ending its inquiry with the no-evidence-of-psychosis conclusion, the dissent ignores the possibility that the continuous features of schizotypal personality disorder standing alone, i.e., without transient exacerbations and psychotic episodes, might satisfy the requirements of § 17(a). Although the dissent begins by couching its concerns in terms of causation and timing, the analytically prior conclusion it must reach is that its perceived absence of evidence of a psychotic episode at the instant of the commission of the offenses renders Long ineligible for an insanity instruction.

Resolving the case on that basis without elaboration, the dissent ignores the fact that there is an abundance of evidence that Long's actions were at the least a result of the continuous features of the schizotypal personality disorder from which he suffered at the time he acted. This obviates any concerns about timing and causation. The proper analysis would then proceed to address the next matter: May a mental disease such as schizotypal personality disorder (during a non-psychotic interval) that is unarguably severe in the colloquial sense, but is not a psychosis, be classified as legally severe under § 17(a)? That, at least, is an open and perhaps debatable question in this circuit. In United States v. Eff we said (but admittedly did not hold) that a mental disease need not be a psychosis to qualify as severe.[38] If Eff is correct — and the dissent offers no reason why it is not — then the dissent would be forced to address whether, unlike the defendant in Eff, Long produced sufficient evidence that his disorder rendered him unable to appreciate the nature and quality or the wrongfulness of his actions. Even though technically that is an open question in this circuit, the choice of analogy between Dixon and Eff is not debatable.

First, in Eff the defendant's disorder "only establishe[d] that [he] had a diminished capacity to understand and anticipate the consequences of his actions, that he was not focused on the wrongfulness or the consequences of his acts of arson, and that [he] makes judgments similar to an eight-year-old child."[39] Whatever else can be said about eight-year-old children and their judgments, they are not ordinarily described as suffering from "the most severe type of personality disorder, which is associated with bizarre thinking and

---

[38] 524 F.3d 712, 718 (5th Cir. 2008)

[39] Id. (footnote omitted).

paranoid mentation." That is how Dr. Friedberg described schizotypal personality disorder.

Second, the defendant in Eff was employed as a firefighter and was charged with arson. That, we said, rendered "the assertion that [the defendant's mental disease] completely prevented him from knowing that setting fires was wrong . . . incredible."[40] Whatever the merit of that conclusion, although Long, perhaps as a feature of his illness, fancied himself something of a roving guardian of national security, he was in fact a nurse, not a counterterrorism official.

Finally, and most tellingly, according to the unrebutted evidence offered at trial, Long was not merely unfocused on the wrongfulness or the consequences of his actions; he believed that he acted in the service of goals such as teaching parents to protect their children and highlighting vulnerabilities to improve national security. In contrast, the defendant in Eff said during his confession that he committed the crime at issue "'for the extra money. I did it because [my supervisor] was pissing me off . . . . I thought, "I'll get you guys . . . for doing this to me."'"[41]

Eff was an unabashed attempt to shoehorn an illness that, at most, vitiates volition into a formulation of the insanity defense that expressly repudiated the volitional test of the Model Penal Code.[42] In contrast, Dixon was a case — like this one — in which the defendant's illness interfered with thought, not volition. There is no suggestion that Long has attempted to prove only that he was driven

---

[40] Id.

[41] Id. at 718 n.7 (second omission in original).

[42] See id. at 718 (examining sources that indicate Congress clearly intended to repudiate the Model Penal Code's approach to a lack of volition).

by something like an irresistible impulse. Instead, the bulk of the relevant testimony relates to the manner in which Long's disturbances of thought affected his ability to appreciate his actions.

The dissent cites Dr. Friedberg's testimony that an individual with schizotypal personality disorder is generally able to appreciate the nature and quality of his actions and that a person who attempts to cover up his crimes is generally able to appreciate the wrongfulness of his actions as support for denying Long the insanity instruction.[43] But Dr. Friedberg did not testify, and under Rule 704(b) could not have testified, that Long possessed the requisite appreciation of his actions. In light of Dixon's conclusion that even a hostile witness can provide sufficient evidence to permit a reasonable juror to conclude clearly and convincingly that a defendant was insane, the dissent must do more than cite these isolated generalities offered by Dr. Friedberg to support its conclusion. It must also grapple with the wrongfulness element and overcome Dixon's repudiation of its theory that efforts to evade detection prevent any reasonable juror from concluding that the defendant was insane. The dissent does neither.

---

[43] The dissent misrepresents Dr. Friedberg's testimony in an important way. In the same discussion (during the government's cross-examination of Dr. Friedberg) about the probative value of efforts to evade detection that the dissent cites for the proposition that Dr. Friedberg believed "generally" that such acts indicate an awareness of wrongfulness, Dr. Friedberg said the following:

In [Long's] particular case where you have, you know, a severe paranoid disorder, that's all part of his guarded nature, and so I don't know if it's, you know, directly, you know, to not get caught or not be involved in, you know, the great plot that's out there, but there's little doubt that that is the general feeling when those findings [of efforts to evade detection] occur.

Omitting Dr. Friedberg's qualification of his general testimony in Long's specific case, and his tying that qualification to the peculiarities of Long's disorder in a plausible way, leaves the reader with a mistaken impression.

Unlike the dissent, however, we are not required to consider only the continuous features of Long's schizotypal personality disorder, because we conclude that Long did adduce sufficient evidence on the basis of which a reasonable juror could conclude that his acts clearly and convincingly were the result of delusions and hallucinations (which constituted a psychotic episode) at the times that he acted. We therefore see Dixon as the appropriate analogy, and we afford Long the same remedy that we afforded Dixon. After it hears from Long and from the government on rebuttal, the jury might well not find that Long was legally insane at the time of his crimes. But, if the jury should credit his evidence, it could reasonably conclude the opposite. We are convinced that Long's evidence is legally sufficient to entitle him to a jury's determination on that issue.

## III. CONCLUSION

We end where we began: The issue before us today is not whether Long's evidence would compel a jury to find that he was legally insane when he committed the crimes charged; rather, it is whether his evidence is sufficient to put the question of this affirmative defense to the factual determination of a jury of his peers. For the foregoing reasons, we are satisfied that it is, and so REVERSE Long's convictions on all counts and REMAND for further proceedings consistent with this opinion.

EMILIO M. GARZA, Circuit Judge, dissenting:

Though the majority appears to rely upon our precedent in United States v. Dixon, 185 F.3d 393 (5th Cir. 1999) to support its holding that a jury instruction on insanity should have been provided in this case, the standards set out in Dixon and in 18 U.S.C. §17 require that there be a link between the defendant's mental illness and his criminal conduct)) a link that is not present on the record here.  Accordingly, I respectfully dissent.

18 U.S.C. §17 is the cornerstone of the analysis of whether a jury instruction on insanity should issue.  It reads:

(a) Affirmative defense.--It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) Burden of proof.--The defendant has the burden of proving the defense of insanity by clear and convincing evidence. [Emphasis added]

Under § 17, a defendant must show the following: (1) that he had a severe mental disease or defect, (2) at the time of the commission of the acts, (3) as a result of which (4) he was unable to appreciate the nature and quality or the wrongfulness of those acts.  Dixon states that a § 17 jury instruction should be submitted to the jury "when the evidence would allow a reasonable jury to find

that insanity has been shown with convincing clarity."[1] Dixon, 185 F.3d at 404. In other words, a jury instruction on the insanity defense is required if "the evidence would permit the jury to find to a high probability that defendant was insane." Id. Though we construe the evidence in the light most favorable to the defendant, id., the defendant must still provide the requisite quantum of evidence in order to merit the insanity instruction.

The majority opinion glosses over elements (2) and (3) in concluding that there was enough evidence to support a jury instruction on insanity in this case. The district court "may withhold the insanity instruction if it concludes that the relationship between a defendant's mental illness history and his criminal conduct has not been explained or examined in any meaningful way." Id. at 407. Here, because the psychosis that was part of his schizotypal personality disorder was episodic and intermittent in nature, Long has not demonstrated with "convincing clarity" that he was experiencing psychosis that would prevent him from distinguishing right from wrong at the time he committed the offense. The evidence thus does not establish a high probability of a causal link between his disease and an inability to appreciate the nature and quality or wrongfulness of his acts.

Dixon holds that there must be evidence to support the inference that the defendant was unable to appreciate his wrongdoing at the time he committed the criminal acts. In Dixon, the court stated that evidence of the defendant's mental illness alone was not enough for him to meet the "convincing clarity" burden;

---

[1] As the majority points out, the "convincing clarity" standard is no higher than the "clear and convincing" standard required for the defendant to prove the affirmative defense of insanity. See Dixon, 185 F.3d at 404.

rather, there must be sufficient evidence for a rational jury to make the connection between the illness and the conduct itself:

> Obviously, this means that some kind of expert testimony is needed to explain the relationship between Dixon's medical history and his criminal actions. Helpful testimony would describe the characteristics of his mental illnesses and the effect of such illnesses on his ability to appreciate wrongdoing. This type of testimony could assist a jury in resolving the "ultimate issue" in an insanity defense, and it is hard to imagine how the jury could adequately resolve these issues without such assistance. [Emphasis added].

Id. at 406. In Dixon, the Court found that the insanity instruction was warranted where there was testimony explaining how defendant's mental illness could have manifested itself at the time he committed the offense, and how his illness might have acted to prevent him from recognizing the wrongfulness of his acts.[2] Id. at 407.

In the present case, Dr. Friedberg testified at trial that Long had a long-standing schizotypal type personality disorder characterized by a "general mentation" of irrational bizarre thinking with periods of episodic psychosis during which he lost contact with reality. Dr. Friedberg also testified that someone with schizotypal personality disorder is generally able to appreciate the

---

[2] For example, the evidence showed that Dixon was off his medication for two days before he committed his criminal acts, and that soon after his detention he appeared "agitated, delusional, and hostile." Dixon, 185 F.3d at 407. There was also testimony by the state's psychiatric expert from which the jury could infer that Dixon was having delusions about the victim. Id.

nature and quality of his acts.[3] It is therefore central to our inquiry whether Long suffered episodes of psychosis at the time of his acts such that he was unable to appreciate their nature and quality or wrongfulness. Dr. Friedberg did not provide any evidence that Long suffered from such episodes during the commission of the offense, and in fact opined that Long's actions in avoiding detection were generally indicative of the ability to distinguish right from wrong.[4] Long never described those voices or his hallucinations to Dr. Friedberg as part of a clinical evaluation, and the first appearance of this evidence is at trial during Long's own testimony.[5]

---

[3] This is not to say that only a diagnosis of psychosis meets the elements of §17(a). In this case, the defendant's expert testified that Long's disease absent the psychotic episodes would not necessarily prevent Long from appreciating the nature of his crimes. Because the psychotic episodes described by Dr. Friedman provide the only link between the appreciation element of §17(a) and Long's disease, I focus on whether Long suffered from these psychotic episodes. Thus, I agree with the majority that the "content of the diagnosis," not merely its label, is at the heart of the analysis; here, there is little evidence (much less clear and convincing evidence) that a diagnosis of schizotypal personality disorder without psychotic episodes would lead to Long's inability to appreciate the wrongfulness of his acts.

[4] For example, Long used self-adhesive envelopes, gloves and threw away the top and bottom copies of his letters in order to remove detection of fingerprints, purchased stamps at busy times and mailed the letters at various locations in order not to draw attention to himself.

[5] Moreover, this panel has not considered all the evidence that was before the district court. After oral argument, the Government filed with this Court an unopposed motion to supplement the record on appeal with a letter from the Warden at the Federal Medical Center and a mental health evaluation written by Dr. Jim Womack. At the pre-trial stage, the district judge ordered this evaluation as pertinent to the issues of Long's competence to stand trial (which is not on appeal) and Long's mental state at the time of the commission of the crimes. ROA 97-98. The motion to supplement was properly referred to Judge Wiener as a single judge matter. 5TH CIR. R. 27.2.

The standard for granting a motion to supplement the record on appeal is that the Court "will not enlarge the record on appeal with evidence that was not before the District Court." McIntosh v. Partridge, 540 F.3d 315, 327 (5th Cir. 2008)(internal citations omitted). The Government averred in its motion that the letter and report were available to the district judge when he refused to give the insanity instruction. Significantly, Long's counsel did not object to the supplementation of the record. Judge Wiener, in denying the Government's

The majority claims that between the diagnostic criteria of schizotypal personality disorder, the testimony of Dr. Friedberg, Long's mother and Long, there is "sufficiently clear and convincing evidence for a reasonable juror to be able to conclude that he suffered from a severe mental disease or defect at the time he committed his crimes." However, the majority conflates the question of "severity" with the question of whether there is clear and convincing evidence that, at the time of the commission of the crimes, Long was experiencing the condition that prevented him from appreciating the nature and wrongfulness of his acts. Even assuming arguendo that Long's disease meets §17(a)'s severity requirement, a severe disease or defect must still be directly connected to the defendant's lack of appreciation of the wrongfulness of his acts. As Long's own expert testified, the "general mentation" of schizotypal personality disorder alone would not prevent Long from appreciating the nature and quality or wrongfulness of his acts, nor would it necessarily lead to the loss of contact with reality. Nothing else in the record suggests otherwise.

---

motion, cited several evidentiary rationales) ) specifically, that the documents (1) had not been "identified, offered and received" at trial, (2) had not been authenticated (FED. R. EVID. 901, 902) and (3) purportedly contained testimonial out-of-court statements in violation of Crawford v. Washington, 541 U.S. 36 (2004). Supplementing the record on appeal does not implicate evidentiary issues which are properly matters for the district court, and those issues are not germane to whether an appellate court can properly consider the letter and the report as part of the record on appeal.

It is clear, however, that this Court would still have to address the implication of these documents on the district court's decision not to issue the insanity instruction. The record clearly reflects that the district court ordered these documents to be prepared for purposes of considering the issue of competency and sanity, pursuant to FED. R. CRIM. P. 12.2(c). The record does not, however, indicate, nor have the parties addressed, whether and to what extent the court used these documents in making the legal decision on whether to submit an issue on insanity. That issue would require further briefing from the parties. At the very least, the motion to supplement should have been granted.

The necessity of this causal link is illustrated by a similar case arising out of the Tenth Circuit, in which both state and government experts agreed that the defendant suffered from Multiple Personality Disorder (MPD), and the relevant question was whether or not the "dominant" or "host" personality was in control at the time the defendant committed the crime. See United States v. Denny-Shaffer, 2 F.3d 999 (10th Cir. 1993). The Tenth Circuit concluded that the evidence was sufficient to support inferences by the fact-finder that the defendant suffered from a severe mental disease or defect (MPD); that her dominant or host personality was not in control so as to cause the commission of the offense and was not aware that an alternate personality was responsible for the defendant's actions; and thus, that as a result of the severe mental disease or defect the host personality was unable to appreciate the nature and quality or wrongfulness of the conduct controlled by the alternate personality. Denny-Shaffer, 2 F.3d at 1016. The analogy with the instant case is clear.[6] The existence of the severe mental disease or defect (such as MPD, or schizotypal personality disorder) alone is not enough for the purposes of §17(a); there must be sufficient evidence of a temporal and causal nexus between the symptoms of the disease and the commission of the acts themselves.[7] See also United States

---

[6] Significantly, in Dixon, this Court cited to Denny-Shaffer and noted: "In reversing, the court of appeals [in that case] was careful to note that 'a factual showing or jury finding that a defendant suffers from MPD, without more, [does not] automatically satisf[y] [§ 17's] requirements.' . . . Instead, in finding an insanity instruction appropriate, the court of appeals explicitly relied on expert testimony establishing that (1) the defendant was suffering from MPD at the time of the crime and (2) the host personality was unaware of the criminal conduct." Dixon, 185 F.3d at 406 (internal citations omitted).

[7] The majority mischaracterizes this position as requiring an expert to have examined the defendant during the commission of the crimes. Of course, this is an absurd result: what the "clear and convincing" standard does require, however, is expert testimony to establish that the symptoms Long described at trial are consistent with a "break from reality" sufficient

v. Whitehead, 896 F.2d 432, 433-36 (9th Cir. 1990)(affirming district court's denial of jury instruction where neither expert nor other witnesses could establish that defendant's Post-Traumatic Stress Disorder manifested itself on day of robbery, such that defendant could not appreciate nature or wrongfulness of crime).

The majority's disquisition on the judicial role in determining insanity misses the point that in this case, the "clear and convincing evidence" required to prove the elements of §17(a) is simply absent. The only testimony in this case that tended to show that Long experienced delusions and hallucinations at the time of the commission of his acts was provided by Long himself. This alone, without expert testimony to aid the fact-finder in concluding that the symptoms Long described could have prevented him from appreciating the wrongfulness of his acts, does not support a finding that §17(a) has been satisfied. See, e.g., United States v. Keen, 96 F.3d 425, 430-31 (9th Cir. 1996)(upholding district court's decision to strike insanity defense where defendant sought to introduce only his own testimony and testimony of family members without expert corroboration).

Finally, and on a closely related point, the majority incorrectly characterizes the role of the expert witness in clarifying the link between a defendant's disease and whether the defendant appreciates the wrongfulness of his acts. While an expert witness may not offer opinion testimony as to whether the defendant had the "mental state or condition constituting an element of the crime charged or of a defense thereto," FED. R. EVID. 704(b), the rules of evidence obviously do not prevent experts from providing the evidence necessary for the

---

to meet the appreciation element of §17(a).

fact-finder to make the inferential leap between the symptoms experienced by the defendant at the time of the crime and the defendant's appreciation of the wrongfulness of his acts. Such evidence, assisted by expert explication, Dixon, 185 F.3d at 406, is exactly what §17(a) requires.[8]

I disagree with the majority that Long has met his burden under 18 U.S.C. §17 of showing that a reasonable jury would believe with a high probability that he was insane at the time of his crimes. The district court did not err in refusing to issue the insanity instruction to the jury. Accordingly, I would affirm the judgment of conviction, and respectfully dissent.

---

[8] In Denny-Shaffer, 2 F.3d at 1007-09, for example, expert testimony that the defendant's host personality was not in control at the time of the commission of the crime was necessary for the court's legal conclusion that the appreciation element of §17(a) was satisfied. See also Whitehead, 896 F.2d at 435 ( finding that although expert witness found it "possible" that some of defendant's symptoms were present on day of crime, "no reasonable fact finder could view [expert's] testimony as establishing with convincing clarity that [defendant] could not appreciate the nature or wrongfulness of the robbery.")