In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2074

THE ESTATE OF NORMAN BLANCO,
by its personal representative STEVEN C. BLANCO,

*Plaintiff-Appellant,*

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA,
PRUVALUE INSURANCE BENEFITS TRUST, and
PORSCHE ENGINEERING SERVICES, INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-cv-01200-LJM-WTL — **Larry J. McKinney**, *Judge.*

ARGUED NOVEMBER 4, 2009—DECIDED MAY 21, 2010

Before CUDAHY, FLAUM, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* The phrase "preexisting condition" was frequently in the news as efforts to enact national health care reform were debated over the last year. And although our case today involves a preexisting condition

exclusion, there is a twist. The clause in this case is not one that denies coverage for health care expenses. Instead, it's in an ERISA plan (the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 101 *et seq.*) promising to pay long term disability benefits to an employee who can no longer do his job. The case is a sad one as the employee, Norman Blanco, died after he struck out in the district court. His estate, which was substituted to fill his shoes, has carried on with this appeal from the judgment of the district court.

Blanco started working as an engineer at Porsche Engineering Services, Inc., in Troy, Michigan, on April 4, 2005. He was 45 years old at the time. One month later, he became a beneficiary under the company's welfare benefit plan, a plan covered by ERISA. The plan was underwritten and administered by The Prudential Insurance Company of America. It provided both short and long term disability benefits (STD and LTD) for Porsche employees who were unable to work.

On July 27, 2005, a little less than four months after he came on board at Porsche, Blanco had a heart attack. He was hospitalized until August 1 and again from August 3 to 5. On August 25, being unable to return to work, Blanco submitted a claim for both STD and LTD benefits. On the attending physician statement submitted along with his claim, a cardiologist, Dr. Robert Fleming, noted that Blanco experienced an acute myocardial infarction and that he suffered

from dilated cardiomyopathy[1] and congestive heart failure (CHF).[2] The doctor noted that Blanco was also limited by his "[r]ecent MI - severe ischemia/dilated cardiomyopathy, CHF class III-IV."

Blanco's claim for STD benefits was approved but they expired on November 1, 2005. The claim for LTD benefits, however, did not go Blanco's way. Prudential denied the claim pursuant to a preexisting condition exclusion in the plan. The denial was affirmed during the plan's review process. Blanco's ERISA suit was ultimately rejected when the district court granted Prudential's motion for summary judgment.

If Blanco's heart attack had occurred anytime after May 4, 2006 (i.e., 282 days after it actually hit), the

---

[1] This occurs when the heart cannot pump blood effectively and becomes enlarged and weakened. Anthony S. Fauci et al., *Harrison's Principles of Internal Medicine* 1481 (17th ed. 2008) ("LV [left ventricular] and/or right ventricular (RV) systolic pump function is impaired, leading to progressive cardiac dilatation (remodeling).").

[2] Heart failure, or congestive heart failure, occurs when the heart can no longer pump enough blood to the rest of the body. Anthony S. Fauci et al., *Harrison's Principles of Internal Medicine* 1443 (17th ed. 2008) ("Heart failure (HF) is a clinical syndrome that occurs in patients who, because of an inherited or acquired abnormality of cardiac structure and/or function, develop a constellation of clinical symptoms (dyspnea [shortness of breath] and fatigue) and signs (edema and rales) that lead to frequent hospitalizations, a poor quality of life, and a shortened life expectancy.").

preexisting exclusion clause in the plan would not have kicked in. Because his disability occurred when it did, Blanco had to get past two roadblocks to receive benefits. The plan's preexisting exclusion clause defeats a claim for LTD benefits if an employee like Blanco:

    A. received treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines, or followed treatment recommendation in the 3 months prior to the effective date of coverage, or

    B. had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 3 months prior to his effective date of coverage.

Before we get to the main issue—whether the preexisting condition exclusion as defined by the policy was properly invoked—we must resolve a dispute over the evidence. Instead of relying on the record before Prudential when it made its decision, Blanco submitted additional affidavits, his own and one from each of three treating physicians. The affidavits recounted Blanco's visits to each physician and explained the treatment he received. The district court, however, excluded the affidavits because it determined that the existing record was adequate for it to make an informed and independent judgment.

The district court has the discretion to "limit the evidence to the record before the plan administrator, or . . . [to] permit the introduction of additional evidence necessary

to enable it to make an informed and independent judgment." *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 490 (7th Cir. 2007). Therefore, we review a decision on which route to take only for an abuse of discretion. We only reverse the decision of the district court if it cannot be rationally based upon the record evidence, is based on an erroneous legal conclusion, or is supported by clearly erroneous factual findings or clearly appears arbitrary.

The most important factor a district court must consider is whether the new evidence is necessary to make an informed and independent judgment. The affidavits, which were created months after the examinations and with an eye towards litigation, do not add much to the record. Indeed, they are particularly unnecessary because the district court already had the medical records the physicians created while treating Blanco.

The district court properly considered other factors as well. Evidence is more appropriately admitted if it concerns important plan terms rather than historical facts about the claimant. Since the affidavits deal with historical facts concerning Blanco, this factor cuts against admitting them. Additionally, the district court may consider whether the plan administrator faced a conflict of interest and whether the parties had a chance to present their evidence in the administrative proceeding. *Patton*, 480 F.3d at 491 (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993)). This factor is no help to Blanco because we have held

there is no conflict of interest when a company uses in-house medical personnel to review medical records. *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006). Furthermore, Blanco had other opportunities, several in fact, to present this evidence at earlier stages in the proceedings. Finally, excluding the "new evidence" serves two important purposes—it discourages sandbagging and pays tribute to the goal of requiring the exhaustion of administrative remedies. For these reasons, the district court was within its discretion to exclude Blanco's new affidavits.

The facts do not appear to be in serious dispute. Blanco has a long history of progressively worsening heart disease. He had a heart attack in 1999 and a stent[3]

---

[3]  A stent is a wire metal mesh tube used to prop open an artery during angioplasty—the technique of mechanically widening a narrowed or obstructed blood vessel.

> The stent is collapsed to a small diameter and put over a balloon catheter. It's then moved into the area of the blockage. When the balloon is inflated, the stent expands, locks in place and forms a scaffold. This holds the artery open. The stent stays in the artery permanently, holds it open, improves blood flow to the heart muscle and relieves symptoms (usually chest pain). Within a few weeks of the time the stent was placed, the inside lining of the artery (the endothelium) grows over the metal surface of the stent.

American Heart Association, http://www.americanheart.org/presenter.jhtml?identifier=4721 (last visited Apr. 27, 2010).

inserted in 2002. He also had a cardiac catherization[4] in 2004. Blanco's cardiomyopathy and CHF were initially documented in 2004. At that time, he had an ejection fraction (EF) of 20%,[5] which is significantly below normal.

Cardiomyopathy and CHF are progressive conditions. Once they exist, they don't get better, only worse. Therefore, Blanco's cardiomyopathy and CHF were certainly preexisting during the "look back" period—the three months before his heart attack. During that period, Blanco also visited a physician, Dr. Bobzien, for testicular pain. During a routine examination, it was discovered that Blanco had a blood pressure of

---

[4] This is a procedure to examine blood flow to the heart and test how well the heart is pumping. A doctor inserts a thin plastic tube (catheter) into an artery or vein in the arm or leg. From there it can be advanced into the chambers of the heart or into the coronary arteries. This test can measure blood pressure within the heart and how much oxygen is in the blood. It's also used to get information about the pumping ability of the heart muscle. American Heart Association, http://www.americanheart.org/ presenter.jhtml?identifier=4491 (last visited Apr. 27, 2010).

[5] An ejection fraction measures how much blood the left ventricle pumps out during every contraction. A normal ejection fraction is 55-70%. Mayo Clinic, http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited Apr. 27, 2010).

210/132.[6] Blanco explained that his blood pressure was so high because he forgot to take his blood pressure medication that day, although he usually did not forget to take it. Dr. Bobzien recommended that Blanco be hospitalized because he was in a hypertensive crisis. Blanco talked Dr. Bobzien out of having him hospitalized by insisting that he had just forgotten to take his medication that day. Dr. Bobzien implored Blanco to take his medication as quickly as possible, warned him of potential symptoms to look for, and sent him on his way.

With Blanco's extensive medical history in mind, we move on to the central issue: whether Blanco's disability was caused by a preexisting condition under either subsection of the policy. We review the district court's denial of Blanco's benefits *de novo*. We regularly recognize and uphold preexisting condition exclusions. *See e.g., Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429 (7th Cir. 1994); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 936 (7th Cir. 1989).

Blanco had a preexisting condition under subsection (a) of the policy. By stating that he regularly took his blood

---

[6] Normal blood pressure is 90-119/60-79, pre-hypertension is 120-139/80-89, Stage 1 Hypertension is 140-159/80-89, and Stage 2 Hypertension is 160+/100+. Anthony S. Fauci et al., *Harrison's Principles of Internal Medicine* 1553 (17th ed. 2008); National Heart Lung and Blood Institute, http://www.nhlbi.nih.gov/health/dci/Diseases/hyp/hyp_whatis.html (last visited Apr. 27, 2010).

pressure medication, but forgot to do so on the day of his doctor's appointment, Blanco admitted he was taking prescription drug medication for his heart during the look-back period. Both sides agree that Blanco was taking Lisinopril during the look-back period, but Blanco argues that he was only taking it for hypertension and not for any of the disabling conditions. Lisinopril treats both hypertension and CHF. During the look-back period Blanco had both hypertension and CHF. Therefore, Blanco was using a prescription drug to treat his CHF (one of his disabling conditions) during the relatively short look-back period.

Blanco admits that he was taking prescription medication for hypertension during the look-back period. That triggers the preexisting condition exclusion under subsection (a) of the policy. Blanco's disabilities—CHF, dilated cardiomyopathy—were almost certainly due, at least in part, to Blanco's extreme hypertension. Therefore, even assuming he was taking prescription drugs just for hypertension, he would not be eligible for disability under the policy. Using the same logic, Blanco is not eligible for LTD because he also received consultation for his hypertension during his visit to the doctor during the look-back period.

Blanco also had a preexisting condition under subsection (b) of the policy, which defines a condition as preexisting if there were symptoms during the look-back period for which an ordinarily prudent person would have consulted a health care provider. The applicability of this subsection turns on the definition of the word symptom,

which is not defined in the policy. The dictionary defines symptom as "subjective evidence of disease or physical disturbance; *broadly*: something that indicates the presence of bodily disorder." Merriam-Webster, http://www.merriam-webster.com/dictionary/symptom (last visited Apr. 27, 2010). Blanco's extraordinarily high blood pressure during the look-back period is the only potential symptom noted in the record for which an ordinarily prudent person would have consulted a health care provider.[7] If we use the first part of the definition, which is the medical definition of symptom,[8] Blanco's extraordinarily high blood pressure would technically not be a symptom. If we use the broad definition of a symptom, Blanco's blood pressure would be a symptom. The purpose of the policy is to exclude from coverage a person who is aware of something—be it a sign or symptom—for which a reasonably prudent person should seek treatment. Since Dr. Bobzien told

---

[7] It would be almost impossible for a person in Blanco's condition (EF 20%) not to have had symptoms of his various heart diseases during the look-back period unless he did not so much as walk up a flight of stairs. Since there is no evidence in the record of such symptoms, however, we must assume they did not occur.

[8] Medical professionals typically differentiate between a sign and a symptom. A symptom is an indicator of a disease that a patient reports (e.g., fatigue or chills) whereas a sign is an indicator of a disease that a health professional discovers during an examination (e.g., temperature of 104 degrees).

Blanco of his extraordinarily high blood pressure and recommended hospitalization, Blanco's hypertension was a preexisting condition under subsection (b) of the policy. Therefore, Blanco is not eligible for LTD because his disability—in particular his CHF and dilated cardiomyopathy—was due to this preexisting condition.

For these reasons, the judgment of the district court is AFFIRMED.