# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 7, 2011

No. 09-10881

Lyle W. Cayce
Clerk

THE ESTATE OF WILBERT LEE HENSON, deceased; BARBARA KAY
HENSON REED, Individually and on behalf of The Estate of Wilbert Lee
Henson; IWILLER G HENSON HENDRIX; WILMA LYNN HENSON;
SHELISHA RICHARDSON,

Plaintiffs - Appellees

v.

KAYE KRAJCA,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:06-CV-44

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

LESLIE H.  SOUTHWICK, Circuit Judge:[*]

Following Wilbert Henson's death while in pretrial detention, his family brought suit alleging the deprivation of Henson's constitutional rights.  *See* 42 U.S.C. § 1983.  Defendant Kaye Krajca filed a motion for summary judgment, asserting qualified immunity.  The district court denied the motion, and Krajca appealed the collateral order.  We REVERSE and REMAND.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-10881

FACTS AND PROCEDURAL HISTORY

On Tuesday, November 23, 2004, Henson was arrested in Wichita County, Texas, on a bond forfeiture warrant for driving with a suspended license. He was taken to the downtown Wichita County Jail. When Henson arrived at the jail, he complained of trouble breathing. He informed the jail nurse on duty, Michelle George, that he suffered from chronic obstructive pulmonary disease and emphysema. He also told her that he had recently been treated at the emergency room for pneumonia, but that he did not fill the prescriptions given to him at that time for an antibiotic, prednisone, and an inhaler. Nurse George gave Henson an antibiotic and an inhaler, and she scheduled him for the next doctor's call, to take place the next morning at the downtown jail.

That night, Henson was moved from the jail to the jail annex. Therefore, he was not at the jail for the scheduled doctor's call. When Nurse George realized this, she scheduled Henson for the next doctor's call at the annex. This usually would have occurred the next day, November 25, but no doctor's call occurred then because it was Thanksgiving Day.

At the annex, Henson's health declined. His breathing worsened, and other inmates requested medical treatment for him. On November 26, Henson was visited by Nurse Kaye Krajca, who administered breathing treatments and scheduled Henson for the next doctor's call.

On November 27, the detention officers requested that Henson be moved to the medical segregation cell, and Nurse George and Nurse Krajca each authorized the move. In the medical solitary cell, Henson continued to receive breathing treatments and was monitored by detention officers. His health, though, continued to deteriorate. At this point, Henson still had not been examined by a doctor or taken to the hospital.

On November 29, the detention officers found Henson in severe distress. He was short of breath and could not walk or stand. Henson said, "I'm done. I'm

2

No. 09-10881

not gonna make it." Shortly thereafter, Henson stopped breathing. The officers administered CPR until an ambulance arrived, and Henson was pronounced dead at the hospital. The Medical Examiner reported his cause of death as chronic obstructive pulmonary disease.

Henson's family brought suit against various defendants. Nurse Krajca was sued in her individual capacity pursuant to 42 U.S.C. § 1983. Violations of the Fourth and Fourteenth Amendments were alleged, and state law claims were also alleged.

The district court dismissed all claims against Nurse Krajca except for deliberate indifference in violation of the Fourteenth Amendment. She filed this interlocutory appeal seeking to reverse the denial of qualified immunity.

DISCUSSION

When a district court denies summary judgment on the basis of qualified immunity, the order is immediately appealable "to the extent that it turns on an issue of law." *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009) (quotation marks and citation omitted). Our jurisdiction on appeal is limited. We have jurisdiction to determine whether a factual dispute is material, but not whether it is genuine. *Id.* We accept the plaintiff's version of events as true and examine "only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc). We review this question *de novo*. *Id.* at 349.

The doctrine of qualified immunity provides that government officials are immune from liability for civil damages unless (1) the official has violated the plaintiff's constitutional rights, and (2) the official's conduct was "objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007) (citations omitted).

3

No. 09-10881

To support the first element, the Henson family alleged a violation of Henson's constitutional rights under the Fourteenth Amendment. The Fourteenth Amendment requires that state officials not disregard the "basic human needs" of pretrial detainees, including medical care. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc). An official violates this right when she responds to a detainee's serious medical needs with deliberate indifference. *Id.* Deliberate indifference is shown when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This was clearly established law at the time of the incident in question.

Presented to the district court were two alleged failures by Nurse Krajca that could constitute deliberate indifference. Although the district court consolidated its analysis, we will analyze each separately.

The claim against Nurse Krajca is based on two contacts she had with Henson. The first was on November 26, when she was called to the jail annex to visit Henson. Henson told Nurse Krajca his medical history. She filled out a request for Henson to see the doctor on the next doctor's call. She also gave him an albuterol breathing treatment and prescribed that the jail staff give Henson the treatment every four hours. It is disputed how much time Nurse Krajca spent with Henson during this visit. The jail log book indicated she spent ten minutes with Henson, yet Nurse Krajca testified she spent about 90 minutes with him. She did not record any vital signs she may have taken. While Krajca contends that she must not have recorded them because they were normal, the Henson family argues that a reasonable inference from the absence of recorded vital signs is that the information was never taken.

4

No. 09-10881

The only other relevant involvement Krajca had with Henson occurred the next night at approximately 11:00 p.m. Officers first called Nurse George, who was on duty at the jail, to request that Henson be moved to the medical segregation cell because he was still having difficulty breathing. Nurse George approved the move and ordered that the detention officers observe Henson every 15 minutes. The detention officers then called Nurse Krajca for a second opinion. Nurse Krajca independently authorized Henson's move to the medical segregation cell and instructed that his condition be monitored by the detention officers every 30 minutes.

The district court concluded that there was a disputed issue of fact over whether Nurse Krajca had subjective knowledge of Henson's continued or worsening breathing difficulties. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . ." *Farmer*, 511 U.S. at 842. On this interlocutory appeal, we do not have jurisdiction to consider whether disputes of fact exist. *See Kinney*, 367 F.3d at 348.

Thus, there is some evidence Nurse Krajca was aware of Henson's continued breathing difficulties. That evidence does not end our inquiry. Deliberate indifference is shown only when "the official knows of *and* disregards an excessive risk to inmate health or safety . . . ." *Calhoun*, 312 F.3d at 734 (quotation marks and citation omitted) (emphasis added). Officials will have disregarded a risk to an inmate only when they "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quotation marks and citation omitted). "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted).

The undisputed evidence indicates that Nurse Krajca continued the course of treatment begun by another nurse. This course of treatment was the one previously prescribed by a doctor at the emergency room. Nurse Krajca also ordered detention officers to monitor Henson's condition, and she placed Henson on the next doctor's call. The evidence does not suggest that Nurse Krajca "purposefully neglected [Henson's] medical needs . . . ." *See Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).

We have found evidence of deliberate indifference where jail nurses knew of the inmate's medical needs but ignored doctors' explicit treatment orders to meet those needs. *Lawson v. Dall. Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002). To the contrary, in this case, Nurse Krajca continued the course of treatment of a doctor who had previously treated Henson. "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino*, 239 F.3d at 756 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

Further, we are not persuaded by the Henson family's argument that deliberate indifference can be inferred by violations of certain regulations and policies alone. Wichita County Sheriff's Office General Order 30.03 calls for transportation to the hospital of prisoners having "difficulty in sustaining or no breathing." The Texas Nurse Practice Act provides that vocational nurses shall "[o]btain instruction and supervision as necessary when implementing nursing procedures or practices . . . ." 22 Tex. Admin. Code § 217.11(1)(G). Even if Henson should have been transported to the hospital for treatment, or Nurse Krajca should have consulted the prison doctor, such violations at most establish that Nurse Krajca violated a standard of care. The violations do not establish deliberate indifference, which "exists wholly independent of an optimal standard of care." *Gobert*, 463 F.3d at 349.

Nurse Krajca should have been granted qualified immunity as to her treatment of Henson's breathing difficulties.

No. 09-10881

We next examine whether Nurse Krajca exhibited deliberate indifference to Henson's vital signs. There is disputed evidence whether on the same night she was called about moving Henson to a different cell, Nurse Krajca requested Henson's vital signs be taken. Officer Jason Shepherd testified that he was instructed to take Henson's blood pressure and pulse that night and did so. Henson had a blood pressure of 208/107 and a heart rate of 92 beats per minute. He also was sweating profusely. It is disputed whether Nurse Krajca was informed of Henson's vital signs at this time.

Officer Shepherd explained that an officer takes an inmate's blood pressure and pulse rate only if he is instructed to by a nurse or supervisor, and "report[s] it directly to the nurse or to the supervisor, who [then] reports it to the 'on-call nurse' if there is not a nurse at the facility." Although Nurse Krajca was not the on-call nurse that evening, there is evidence she received notice of Henson's vital signs. Officer Wayne Parish stated in a memorandum written at the time of the events that Nurse Krajca requested Henson's vital signs be taken, and she was given information about Henson's medical condition. Nearly four years later, Officer Parish testified in his deposition that Nurse Krajca was given information only about Henson's breathing condition, not his vital signs. The district court concluded that there was a disputed issue of fact over whether Nurse Krajca had subjective knowledge of Henson's vital signs. We accept that there is some evidence Nurse Krajca was aware of Henson's elevated vital signs. *See Kinney*, 367 F.3d at 348.

We now must determine whether Nurse Krajca exhibited deliberate indifference to Henson's constitutional rights by disregarding an excessive risk to his health or safety. *See Calhoun*, 312 F.3d at 734. The plaintiffs have to show that based on the vital signs, Nurse Krajca "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar

conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quotation marks and citations omitted).

Officer Parish's memorandum indicates Nurse Krajca agreed with the first nurse's decision to move Henson to medical solitary when Nurse Krajca was told his vital signs. Henson was moved to medical solitary and placed on 30-minute observation. Nurse Krajca received no other calls from detention officers that Henson was experiencing difficulties or that his condition was worsening. She later said that if Henson had continuing difficulties, she believed he would have requested a nurse as she had instructed him to do on November 26.

There is no evidence in the record that Henson's vital signs constituted a dangerously high reading and warranted a particular course of treatment. There also is no evidence Henson's elevated blood pressure contributed to his death. Nurse Krajca stated that moving Henson to medical segregation for monitoring would have been appropriate given his recent breathing treatment and inhaler use. She testified that those stimulant medications "can temporarily result in higher readings on vitals because the pulse is elevated as a natural result of the medications and coughing related to the impact of such medication."

Nurse Krajca did state, though, that had Henson's elevated vital signs been reported to her, she would have gone to the jail annex and assessed his condition. Instead, she had the detention officers monitor Henson's condition every 30 minutes. Because we accept that there is some evidence Nurse Krajca was aware of Henson's vital signs, her admission essentially is a concession that she did not do what she considered appropriate under the circumstances. If deliberate indifference could be inferred solely from Nurse Krajca's failure to act in a manner consistent with her training, "the standard applied would be more akin to negligence than deliberate indifference." *Hare*, 74 F.3d at 649 (quotation marks and citation omitted). While it might be evidence of negligence, her

No. 09-10881

failure to go to the jail annex and personally assess Henson does not support a finding of deliberate indifference.

The dissent does not address the decision to grant Nurse Krajca qualified immunity as to her treatment of Henson's breathing difficulties. Instead, the dissent insists no immunity is deserved as to Nurse Krajca's response to Henson's elevated vital signs. Relying on medical information from the American Heart Association's website, the dissent contends Henson's vital signs evidenced a hypertensive crisis and required Henson's immediate transport to the hospital. The dissent concludes that Nurse Krajca never administered any treatment for Henson's medical need, and that a jury could reasonably find Nurse Krajca was deliberately indifferent in refusing to treat that need. The dissent diagnoses Henson's condition, prescribes the purported proper course of action, and then finds deliberate indifference for Nurse Krajca's failure to have acted accordingly.

Though we need not decide, we are not convinced the dissent's conclusions are matters appropriate for judicial notice.

Judicial notice must be taken cautiously; it applies only to facts not subject to reasonable dispute. *See* Fed. R. Evid. 201(b). This court previously has taken judicial notice of diagnostic criteria found in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. *United States v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009). There, the legal issue was whether the district court should have permitted the defendant's affirmative defense of insanity to go to the jury. *Id.* at 328. We reasoned that the Manual's "authoritative nature makes the criteria 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Id.* at 334 n.22 (quoting Fed. R. Evid. 201(b)). This court specifically noted that the criteria was being used only as support for expert testimony and evidence already submitted. *Id.* Here, unlike in *Long*, the dissent

relies on a website's information with no other evidence in the record to support its conclusions.

Even if judicial notice of these matters is proper, Nurse Krajca's failure to order Henson's transport to the hospital immediately after receiving notice of his elevated vital signs is in the category of malpractice, not deliberate indifference. *Gobert*, 463 F.3d at 346. There is nothing on which it can be inferred that she "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quotation marks and citation omitted).

Nurse Krajca's actions do not "clearly evince a wanton disregard for any serious medical needs." *Id.* (citation omitted). Thus, the first element of the qualified immunity test is not met, and Nurse Krajca is immune from suit.

We REVERSE the denial of qualified immunity and REMAND in order for the district court to dismiss the Section 1983 claims against Nurse Krajca.

09-10881

OWEN, Circuit Judge, concurring.

I fully join Judge Southwick's opinion, in which he concludes that Kaye Krajca is entitled to qualified immunity. However, I note only that there is an argument asserted by Wilbert Lee Henson's estate and heirs that Judge Southwick's opinion does not consider. That argument is that Krajca's supervisor, Dr. Bolin, intimidated her and other nurses to such an extent that she refrained from sending Henson to the emergency room or from calling Dr. Bolin at home over the Thanksgiving weekend preceding Henson's death. The Henson claimants assert that Krajca had previously caused the death of another inmate, Jason Ray Brown, by failing to send him to the hospital when he had a serious medical condition. These allegations, and the summary judgment facts adduced to support it, fail to raise a material fact question because there is no evidence that Krajca's treatment of Henson rose to the level of a constitutional violation of his rights. For the reasons that Judge Southwick's opinion sets forth, there is no evidence that at the points in time that Krajca attended Henson, she exhibited a wanton disregard for his serious medical needs. Allegations that amount to allegations of negligent treatment do not constitute a claim that would defeat official immunity.

09-10881

DENNIS, Circuit Judge, dissenting.

I respectfully dissent. In holding that Nurse Krajca did not act with deliberate indifference, the majority opinion errs in two ways. First, the majority's analysis disregards evidence in the record from which a reasonable jury could find that Nurse Krajca's decision not to treat one of Henson's serious medical needs, his dangerously high blood pressure, constituted deliberate indifference. Second, the majority's reasoning is inconsistent with that of previous cases from our circuit, in which we have held that conduct less egregious than that of Nurse Krajca could give rise to an inference of deliberate indifference.

A.

It is clearly established in this circuit that a prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (per curiam) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). The plaintiffs here have made such a demonstration, because they have put forth facts from which a jury could reasonably determine that Henson had a serious medical need, his dangerously high blood pressure, and that Nurse Krajca acted with deliberate indifference in not administering any treatment for that need.

When he first saw Nurse Krajca on November 26, 2004, the 61-year old Henson explained to her that he had chronic obstructive pulmonary disease (COPD) and pneumonia. The record shows that the term COPD refers to a group of lung diseases, usually emphysema and chronic bronchitis, which make breathing difficult. The medical examiner who conducted the autopsy concluded that Henson had both of these diseases. As a result of the visit,

12

09-10881

Nurse Krajca ordered that breathing treatments[1] be administered to Henson every four hours.

On November 27, 2004, late in the evening, Nurse Krajca received a phone call about Henson. By this point, it was apparent that Henson had two medical needs. First, he suffered from breathing problems, for which he was receiving breathing treatments at Nurse Krajca's direction. The detention officers called her to obtain permission to move Henson to a different cell so that he would not be exposed to the cigarette smoke of the other detainees.

Second, Henson had a blood pressure of 208/107 and a heart rate of 92 beats per minute, and he was sweating profusely. As the majority explains, the plaintiffs have put forth evidence from which a reasonable jury could choose to believe the testimony of the detention officers — who said that at her request, they measured and informed her of his vital sign measurements, as well as his continued breathing problems — over that of Nurse Krajca, who denied that they told her this information. Contrary to the majority opinion, the record contains evidence from which a jury could reasonably infer that Nurse Krajca did not act with mere negligence with regard to Henson's condition, but that she deliberately disregarded Henson's dangerous vital signs, which warranted immediate medical treatment rather than continued passive observation.[2]

---

[1] These "breathing treatments" consisted of using an updraft nebulizer machine to administer a medication, albuterol, that can aid breathing. The use of these treatments appears to have been an attempt to use an alternative method for administering the medication, because Henson already had an inhaler, which had proven to be ineffective, that administered albuterol.

[2] Of course, since this case is at the summary judgment stage, the evidence must be construed in the light most favorable to the plaintiffs. *Castillo v. City of Weslaco*, 369 F.3d 504, 507 (5th Cir. 2004) ("[T]he court must highlight evidence that, if interpreted in the light most favorable to the plaintiffs, identifies conduct by the defendant that violated clearly established law.").

09-10881

First, there is summary judgment evidence in the record to support what seems to me the fairly straightforward proposition that Henson's blood pressure of 208/107 was a serious medical need which should have received immediate medical attention.[3] The plaintiffs submitted into the record the expert report of a physician, who called Henson's 208/107 blood pressure reading "markedly elevated" multiple times, and noted, "but there is no record of treatment or physician notification" after the measurement was taken. The physician expert added:

---

[3] The proposition that a blood pressure reading of 208/107 constitutes a serious medical need warranting immediate medical attention is confirmed by other reputable sources, such as the American Heart Association. Here, as in *United States v. Long*, 562 F.3d 325 (5th Cir. 2009), I cite to an external source as "support for" evidence that is already contained in the record, *id.* at 335 n.22. The American Heart Association explains that when an individual's "blood pressure reaches levels of 180 or higher for the systolic (top) number OR 110 or higher for the diastolic (bottom) number," that individual is experiencing a "hypertensive crisis" that requires immediate medical attention. *Hypertensive Crisis*, Am. Heart Ass'n, http://www. heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/ Hypertensive-Crisis_UCM_301782_Article.jsp (last updated July 23, 2010). The Association explains:

> There is no safe duration for blood pressure to remain in this range. Do not wait to see if your pressure comes down on its own. Call 9-1-1 immediately for emergency medical assistance. If you can't access the emergency medical services . . . have someone drive you to the hospital right away.

*Id.* In *Blanco v. Prudential Insurance Co. of America*, 606 F.3d 399 (7th Cir. 2010), the Seventh Circuit noted that the plaintiffs' decedent "had a blood pressure of 210/132," for which his doctor "recommended that [the decedent] be hospitalized because he was in a hypertensive crisis," *id.* at 403. In a corresponding footnote, the Seventh Circuit cited to external sources to explain that "Normal blood pressure is 90-119/60-79, pre-hypertension is 120-139/80-89, Stage 1 hypertension is 140-159/80-89, and Stage 2 Hypertension is 160+/100+." *Id.* at 403 n.6 (citing Anthony S. Fauci et al., *Harrison's Principles of Internal Medicine* 1553 (17th ed. 2008), and the website of the National Heart Lung and Blood Institute). *See also Shepherd v. Dallas Cnty.*, 591 F.3d 445, 449 (5th Cir. 2009) (describing the plaintiff's blood pressure reading of 181/133 as "a level considered a 'hypertensive emergency,'" and explaining that the plaintiff "experienced a second hypertensive emergency" when his blood pressure was measured at 242/132).

14

09-10881

> The autopsy findings for Mr. Henson demonstrated marked hypertensive cardiomegaly that indicates that his elevated blood pressure was a long-standing problem but despite a markedly elevated reading, no intervention or followup was provided. With appropriate intake procedures it is likely that this problem would have been detected at that time and with appropriate procedures it is unlikely that this condition would have been allowed to become a threat to Wilbert Henson's life.

The testimony of the nurses supports the expert report. Nurse Krajca stated in her deposition that if she had been told about Henson's breathing problems, 208/107 blood pressure reading, and profuse sweating, "I'm sure I would have gone out there." When asked about her reply, she confirmed, "I'm sure I would have." Similarly, another nurse, Nurse George, when asked what she would have done if she had received the same information about Henson, answered that if she had been told that "anybody's blood pressure was that high . . . I would have went and seen him myself." Thus, a jury could reasonably determine that Henson's blood pressure of 208/107 was a serious medical need.

In addition, a reasonable jury could also conclude that Nurse Krajca acted with deliberate indifference in not administering any medical treatment for that need. After hearing of Henson's medical needs, including his blood pressure, during the November 27 phone call, Nurse Krajca did not trouble herself to visit Henson so she could personally assess his condition, or to call a physician, or to send him to the hospital. Instead, Nurse Krajca authorized the requested move of Henson to a medical segregation cell, and she told the detention officers to monitor Henson's condition every 30 minutes, which they

15

09-10881

did by peering into the cell through a "little slit of glass on the door," as the sheriff described it. Per Nurse Krajca's previous instructions, the officers also continued to administer breathing treatments to Henson every four hours.

Early in the morning of November 29, 2004, the officers found Henson in severe respiratory distress, unable to stand or walk. Henson said that he was "not going to make it." A nurse (not Nurse Krajca) was called, and she ordered that Henson be taken to another room to receive a breathing treatment. At this point, the officers checked Henson's vital signs and found that his blood pressure was 232/161 and his heart rate was 53 beats per minute. He was unable to receive the breathing treatment due to extreme weakness, and then fainted. Henson then began "gurgling" and his eyes rolled to the back of his head. He had also become incontinent. The detention officers tried to wake Henson up, but his blood pressure faded and his pulse stopped. Two officers conducted cardiopulmonary resuscitation until emergency responders arrived. After this, Henson was taken to the hospital, where he was pronounced dead.

The majority seems to implicitly assume that Nurse Krajca's orders to the detention officers to monitor Henson constituted medical treatment of his blood pressure. However, monitoring an individual does not constitute medical treatment — on its own, it does nothing to alleviate symptoms or improve health. The purpose of monitoring is to determine when different or additional medical treatment is needed. Indeed, monitoring an individual's condition is a pointless exercise if no medical treatment would occur as a result of it. The expert report of the physician confirms the understanding that monitoring does not constitute medical treatment: he explained multiple times that after Henson's blood pressure was measured, Henson received no

treatment for his blood pressure, though it measured 208/107.[4]  A reasonable jury could certainly find that Nurse Krajca acted with deliberate indifference in not administering any treatment to Henson for his dangerously high blood pressure.

Finally, regardless of whether a jury would conclude that Henson's untreated, dangerously high blood pressure caused his death, it could still reasonably conclude that Nurse Krajca's deliberate indifference to Henson's dangerously high blood pressure caused Henson to experience pain and suffering, for which the plaintiffs could recover damages.[5]

In sum, a jury could reasonably find that Henson had a serious medical need — dangerously high blood pressure — and that Nurse Krajca was aware

---

[4] Specifically, he stated at different places in a report that "there is no record of treatment or physician notification" after the measurement, that Henson's blood pressure "was not treated or assessed," and that "no intervention or followup was provided."

[5] A plaintiff may make claims and recover damages on behalf of a decedent in a § 1983 action if the relevant state survival statute gives the plaintiff standing to do so:

Standing under the Civil Rights Statutes is guided by 42 U.S.C. § 1988, which provides that state common law is used to fill in the gaps in administration of civil rights suits.  Therefore, a party must have standing under the state wrongful death or survival statutes to bring a claim under 42 U.S.C. §§ 1981, 1983, and 1988.

*Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) (citing *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 390-91 (5th Cir. 1992)) (citation omitted). Here, Barbara Reed, as daughter of Henson and representative of his estate, asserted a claim for damages, including for Henson's pain, suffering, and mental anguish suffered prior to his death, under the Texas Survival Act, which states in relevant part that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." Tex. Civ. Prac. & Rem. Code § 71.021(b).  Thus, Reed has asserted and may claim any damages that Henson would be able to claim, including for his pain and suffering, if he were still alive. *See Flores v. Cameron Cnty., Tex.*, 92 F.3d 258, 272 (5th Cir. 1996) ("The actionable wrong in a [Texas] [S]urvival [Act] action is that which the decedent suffered before death.  The damages recoverable [by the survivors] are those which the decedent sustained while alive." (quoting *Felan v. Ramos*, 857 S.W. 2d 113, 118 (Tex. Ct. App. 1992) (citations omitted))).

09-10881

of it, yet acted with deliberate indifference in deciding to not administer any medical treatment for that need.

## B.

The majority's reasoning also disregards prior cases in which this court has held that deliberate indifference could be inferred where the conduct of the defendants was less egregious than that of Nurse Krajca.

This court held in *Austin v. Johnson* that the plaintiffs had stated an Eighth Amendment deliberate indifference claim sufficient to survive a motion for summary judgment based on qualified immunity, where they alleged that there was a one hour and forty-two minute delay in sending the prisoner to the hospital when his heat stroke condition required immediate medical attention.  328 F.3d 204, 210 (5th Cir. 2006).  In *Austin*, the prisoner "became dehydrated and 'fell out' [became unconscious] at 3:00 p.m."  *Id.* at 206.  Although the defendants administered first aid to the prisoner and he "made a full recovery without permanent damage," *id.*, because the defendants waited until 4:42 p.m. to call an ambulance, their failure to do so earlier "r[ose] to the level of deliberate indifference," *id.* at 210.

This court also held in *Easter v. Powell* that a plaintiff had stated an Eighth Amendment deliberate indifference claim sufficient to survive a motion for summary judgment based on qualified immunity, where the plaintiff alleged that a nurse sent him back to his cell, without medicine prescribed for his heart condition, after she learned that the prison pharmacy was closed for the day.  467 F.3d 459, 463-64 (5th Cir. 2006) (per curiam).  The plaintiff alleged that the nurse knew of his heart condition which was documented in his medical chart, knew that he was experiencing severe chest pain, and yet denied his request for the medicine that he had been prescribed

after he learned that the prison pharmacy was closed.  *Id.* at 463.  The plaintiff was able to obtain medicine "[a]fter four hours of severe pain," but "by the time his pain ceased, blood vessels in his left eye had burst, causing it to fill with blood."  *Id.* at 461.

Finally, this court held in *Harris v. Hegmann* that the plaintiff had alleged sufficient facts to support an inference of deliberate indifference where he alleged that prison staff sent him back to his cell after his jaw had "f[allen] out of place" and re-broken in a surgery clinic, and that a doctor and two nurses disregarded "his urgent and repeated requests for immediate medical treatment for his broken jaw and his complaints of excruciating pain" over the course of a week.  198 F.3d 153, 154-55, 159-60 (5th Cir. 1999) (per curiam).  Eight days after his jaw re-broke, the plaintiff received the needed surgery to repair his jaw at a routine follow-up appointment with the surgery clinic.  *Id.* at 155.

In light of these prior cases, the plaintiffs have stated an Eighth Amendment deliberate indifference claim that should have survived a motion for summary judgment based on qualified immunity.  Nurse Krajca's alleged conduct was even more egregious than that of the defendants in the *Austin, Easter,* and *Harris* cases.  First, under Nurse Krajca's direction, Henson did not receive treatment for more than a day from when she knew that he had dangerously high blood pressure.  In contrast, the delay in *Austin* was an hour and forty-two minutes, and four hours in *Easter*.  Although the delay in the *Harris* plaintiff's treatment was a few days longer than in this case, his condition, a broken jaw, was no doubt very painful, but was not life-threatening in the way that a blood pressure reading of 208/107 is.  Moreover, the delays in *Austin*, *Harris*, and *Easter* ended because in each case, the

09-10881

prisoner eventually received treatment.  In the instant case, the only reason the delay ended was because Henson died.

Second, the *Austin* defendants at least administered first aid to the prisoner, whereas Nurse Krajca administered nothing at all to Henson for his dangerously high blood pressure.  Even assuming arguendo that monitoring Henson somehow constituted medical treatment, *Austin* establishes that a jury can still reasonably infer deliberate indifference where a defendant administered only a minimal amount of treatment when much more substantial medical attention was needed.  328 F.3d at 206, 210 (holding that the defendants acted with deliberate indifference in failing to call an ambulance for almost two hours when the prisoner required immediate hospitalization, even though they had administered first aid to the prisoner during the delay).

Because the majority opinion concludes that no reasonable jury could find that Nurse Krajca acted with deliberate indifference, it does not determine whether her conduct was "objectively unreasonable in light of clearly established law at the time of the conduct in question."  *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007) (citations omitted).  It has been clearly established for decades "that deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment," *Austin*, 328 F.3d at 210 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), and that "refus[ing] to treat . . . any serious medical need constitutes deliberate indifference to those needs," *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).  Indeed, government officials "need only have 'fair warning' that their conduct is unlawful."  *Austin*, 328 F.3d at 210 (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)).  Thus, Nurse Krajca's alleged knowing refusal to treat Henson's

09-10881

hypertensive crisis was objectively unreasonable in light of Supreme Court and Fifth Circuit precedents.

In sum, a reasonable jury could find or infer from the allegations and evidence put forth by the plaintiffs that Nurse Krajca violated Henson's Eighth Amendment rights by deciding not to administer any treatment for his dangerously high blood pressure.  Because the plaintiffs are entitled to an opportunity to prove to a jury the foregoing actionable facts, I would affirm the district court's denial of qualified immunity.

Therefore, I respectfully dissent.