DENNIS, Circuit Judge,
dissenting.
I respectfully dissent. In holding that Nurse Krajca did not act with deliberate indifference, the majority opinion errs in two ways. First, the majority’s analysis disregards evidence in the record from which a reasonable jury could find that Nurse Krajca’s decision not to treat one of Henson’s serious medical needs, his dangerously high blood pressure, constituted deliberate indifference. Second, the majority’s reasoning is inconsistent with that of previous cases from our circuit, in which we have held that conduct less egregious than that of Nurse Krajca could give rise to an inference of deliberate indifference.
A.
It is clearly established in this circuit that a prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official “ ‘refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.’ ” Domino v. Tex. Dep’t of Criminal Justice, 239 F.3d 752, 756 (5th Cir.2001) (per curiam) (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir.1985)). The plaintiffs here have made such a demonstration, because they have put forth facts from which a jury could reasonably determine that Henson had a serious medical need, his dangerously high blood pressure, and that Nurse Krajca acted with deliberate indifference in not administering any treatment for that need.
When he first saw Nurse Krajca on November 26, 2004, the 61-year old Henson explained to her that he had chronic obstructive pulmonary disease (COPD) and pneumonia. The record shows that the term COPD refers to a group of lung diseases, usually emphysema and chronic *348 bronchitis, which make breathing difficult. The medical examiner who conducted the autopsy concluded that Henson had both of these diseases. As a result of the visit, Nurse Krajca ordered that breathing treatments[1] be administered to Henson every four hours.
On November 27, 2004, late in the evening, Nurse Krajca received a phone call about Henson. By this point, it was apparent that Henson had two medical needs. First, he suffered from breathing problems, for which he was receiving breathing treatments at Nurse Krajca’s direction. The detention officers called her to obtain permission to move Henson to a different cell so that he would not be exposed to the cigarette smoke of the other detainees.
Second, Henson had a blood pressure of 208/107 and a heart rate of 92 beats per minute, and he was sweating profusely. As the majority explains, the plaintiffs have put forth evidence from which a reasonable jury could choose to believe the testimony of the detention officers — who said that at her request, they measured and informed her of his vital sign measurements, as well as his continued breathing problems — over that of Nurse Krajca, who denied that they told her this information. Contrary to the majority opinion, the record contains evidence from which a jury could reasonably infer that Nurse Krajca did not act with mere negligence with regard to Henson’s condition, but that she deliberately disregarded Henson’s dangerous vital signs, which warranted immediate medical treatment rather than continued passive observation.[2]
First, there is summary judgment evidence in the record to support what seems to me the fairly straightforward proposition that Henson’s blood pressure of 208/107 was a serious medical need which should have received immediate medical attention.[3] The plaintiffs submitted into *349 the record the expert report of a physician, who called Henson’s 208/107 blood pressure reading “markedly elevated” multiple times, and noted, “but there is no record of treatment or physician notification” after the measurement was taken. The physician expert added:
The autopsy findings for Mr. Henson demonstrated marked hypertensive car-diomegaly that indicates that his elevated blood pressure was a long-standing problem but despite a markedly elevated reading, no intervention or followup was provided. With appropriate intake procedures it is likely that this problem would have been detected at that time and with appropriate procedures it is unlikely that this condition would have been allowed to become a threat to Wilbert Henson’s life.
The testimony of the nurses supports the expert report. Nurse Krajca stated in her deposition that if she had been told about Henson’s breathing problems, 208/107 blood pressure reading, and profuse sweating, “I’m sure I would have gone out there.” When asked about her reply, she confirmed, “I’m sure I would have.” Similarly, another nurse, Nurse George, when asked what she would have done if she had received the same information about Henson, answered that if she had been told that “anybody’s blood pressure was that high ... I would have went and seen him myself.” Thus, a jury could reasonably determine that Henson’s blood pressure of 208/107 was a serious medical need.
In addition, a reasonable jury could also conclude that Nurse Krajca acted with deliberate indifference in not administering any medical treatment for that need. After hearing of Henson’s medical needs, including his blood pressure, during the November 27 phone call, Nurse Krajca did not trouble herself to visit Henson so she could personally assess his condition, or to call a physician, or to send him to the hospital. Instead, Nurse Krajca authorized the requested move of Henson to a medical segregation cell, and she told the detention officers to monitor Henson’s condition every 80 minutes, which they did by peering into the cell through a “little slit of glass on the door,” as the sheriff described it. Per Nurse Krajca’s previous instructions, the officers also continued to administer breathing treatments to Henson every four hours.
Early in the morning of November 29, 2004, the officers found Henson in severe respiratory distress, unable to stand or walk. Henson said that he was “not going to make it.” A nurse (not Nurse Krajca) was called, and she ordered that Henson be taken to another room to receive a breathing treatment. At this point, the officers checked Henson’s vital signs and found that his blood pressure was 282/161 and his heart rate was 53 beats per minute. He was unable to receive the breathing treatment due to extreme weakness, and then fainted. Henson then began “gurgling” and his eyes rolled to the back of his head. He had also become incontinent. The detention officers tried to wake Henson up, but his blood pressure faded *350 and his pulse stopped. Two officers conducted cardiopulmonary resuscitation until emergency responders arrived. After this, Henson was taken to the hospital, where he was pronounced dead.
The majority seems to implicitly assume that Nurse Krajca’s orders to the detention officers to monitor Henson constituted medical treatment of his blood pressure. However, monitoring an individual does not constitute medical treatment — on its own, it does nothing to alleviate symptoms or improve health. The purpose of monitoring is to determine when different or additional medical treatment is needed. Indeed, monitoring an individual’s condition is a pointless exercise if no medical treatment would occur as a result of it. The expert report of the physician confirms the understanding that monitoring does not constitute medical treatment: he explained multiple times that after Henson’s blood pressure was measured, Henson received no treatment for his blood pressure, though it measured 208/107.[4] A reasonable jury could certainly find that Nurse Krajca acted with deliberate indifference in not administering any treatment to Henson for his dangerously high blood pressure.
Finally, regardless of whether a jury would conclude that Henson’s untreated, dangerously high blood pressure caused his death, it could still reasonably conclude that Nurse Krajca’s deliberate indifference to Henson’s dangerously high blood pressure caused Henson to experience pain and suffering, for which the plaintiffs could recover damages.[5]
In sum, a jury could reasonably find that Henson had a serious medical need — dangerously high blood pressure — and that Nurse Krajca was aware of it, yet acted with deliberate indifference in deciding to not administer any medical treatment for that need.
B.
The majority’s reasoning also disregards prior cases in which this court has held that deliberate indifference could be inferred where the conduct of the defendants was less egregious than that of Nurse Krajca.
*351 This court held in Austin v. Johnson that the plaintiffs had stated an Eighth Amendment deliberate indifference claim sufficient to survive a motion for summary judgment based on qualified immunity, where they alleged that there was a one hour and forty-two minute delay in sending the prisoner to the hospital when his heat stroke condition required immediate medical attention. 328 F.3d 204, 210 (5th Cir.2006). In Austin, the prisoner “became dehydrated and ‘fell out’ [became unconscious] at 3:00 p.m.” Id. at 206. Although the defendants administered first aid to the prisoner and he “made a full recovery without permanent damage,” id., because the defendants waited until 4:42 p.m. to call an ambulance, their failure to do so earlier “r[ose] to the level of deliberate indifference,” id. at-210.
This court also held in Easter v. Powell that a plaintiff had stated an Eighth Amendment deliberate indifference claim sufficient to survive a motion for summary judgment based on qualified immunity, where the plaintiff alleged that a nurse sent him back to his cell, without medicine prescribed for his heart condition, after she learned that the prison pharmacy was closed for the day. 467 F.3d 459, 463-64 (5th Cir.2006) (per curiam). The plaintiff alleged that the nurse knew of his heart condition which was documented in his medical chart, knew that he was experiencing severe chest pain, and yet denied his request for the medicine that he had been prescribed after he learned that the prison pharmacy was closed. Id. at 463. The plaintiff was able to obtain medicine “[a]f-ter four hours of severe pain,” but “by the time his pain ceased, blood vessels in his left eye had burst, causing it to fill with blood.” Mat461.
Finally, this court held in Harris v. Hegmann that the plaintiff had alleged sufficient facts to support an inference of deliberate indifference where he alleged that prison staff sent him back to his cell after his jaw had “f[allen] out of place” and re-broken in a surgery clinic, and that a doctor and two nurses disregarded “his urgent and repeated requests for immediate medical treatment for his broken jaw and his complaints of excruciating pain” over the course of a week. 198 F.3d 153, 154-55, 159-60 (5th Cir.1999) (per curiam). Eight days after his jaw re-broke, the plaintiff received the needed surgery to repair his jaw at a routine follow-up appointment with the surgery clinic. Id,, at 155.
In light of these prior cases, the plaintiffs have stated an Eighth Amendment deliberate indifference claim that should have survived a motion for summary judgment based on qualified immunity. Nurse Krajca’s alleged conduct was even more egregious than that of the defendants in the Austin, Easter, and Harris cases. First, under Nurse Krajca’s direction, Henson did not receive treatment for more than a day from when she knew that he had dangerously high blood pressure. In contrast, the delay in Austin was an hour and forty-two minutes, and four hours in Easter. Although the delay in the Harris plaintiffs treatment was a few days longer than in this case, his condition, a broken jaw, was no doubt very painful, but was not life-threatening in the way that a blood pressure reading of 208/107 is. Moreover, the delays in Austin, Harris, and Easter ended because in each case, the prisoner eventually received treatment. In the instant case, the only reason the delay ended was because Henson died.
Second, the Austin defendants at least administered first aid to the prisoner, whereas Nurse Krajca administered nothing at all to Henson for his dangerously high blood pressure. Even assuming ar-guendo that monitoring Henson somehow *352 constituted medical treatment, Austin establishes that a jury can still reasonably infer deliberate indifference where a defendant administered only a minimal amount of treatment when much more substantial medical attention was needed. 328 F.3d at 206, 210 (holding that the defendants acted with deliberate indifference in failing to call an ambulance for almost two hours when the prisoner required immediate hospitalization, even though they had administered first aid to the prisoner during the delay).
Because the majority opinion concludes that no reasonable jury could find that Nurse Krajea acted with deliberate indifference, it does not determine whether her conduct was “objectively unreasonable in light of clearly established law at the time of the conduct in question.” Freeman v. Gore, 483 F.3d 404, 410-11 (5th Cir.2007) (citations omitted). It has been clearly established for decades “that deliberate indifference to a prisoner’s serious medical needs violates the Eighth Amendment,” Austin, 328 F.3d at 210 (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)), and that “refusing] to treat ... any serious medical need constitutes deliberate indifference to those needs,” Domino, 239 F.3d at 756 (quoting Johnson, 759 F.2d at 1238). Indeed, government officials “need only have ‘fair warning’ that their conduct is unlawful.” Austin, 328 F.3d at 210 (quoting Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Thus, Nurse Kraj-ca’s alleged knowing refusal to treat Henson’s hypertensive crisis was objectively unreasonable in light of Supreme Court and Fifth Circuit precedents.
In sum, a reasonable jury could find or infer from the allegations and evidence put forth by the plaintiffs that Nurse Krajea violated Henson’s Eighth Amendment rights by deciding not to administer any treatment for his dangerously high blood pressure. Because the plaintiffs are entitled to an opportunity to prove to a jury the foregoing actionable facts, I would affirm the district court’s denial of qualified immunity.
Therefore, I respectfully dissent.

. These "breathing treatments” consisted of using an updraft nebulizer machine to administer a medication, albuterol, that can aid breathing. The use of these treatments appears to have been an attempt to use an alternative method for administering the medication, because Henson already had an inhaler, which had proven to be ineffective, that administered albuterol.

. Of course, since this case is at the summary judgment stage, the evidence must be construed in the light most favorable to the plaintiffs. Castillo v. City of Weslaco, 369 F.3d 504, 507 (5th Cir.2004) ("[T]he court must highlight evidence that, if interpreted in the light most favorable to the plaintiffs, identifies conduct by the defendant that violated clearly established law.”).

. The proposition that a blood pressure reading of 208/107 constitutes a serious medical need warranting immediate medical attention is confirmed by other reputable sources, such as the American Heart Association. Here, as in United States v. Long, 562 F.3d 325 (5th Cir.2009), I cite to an external source as "support for” evidence that is already contained in the record, id. at 335 n. 22. The American Heart Association explains that when an individual’s "blood pressure reaches levels of 180 or higher for the systolic (top) number OR 110 or higher for the diastolic (bottom) number,” that individual is experiencing a "hypertensive crisis” that requires immediate medical attention. Hypertensive Crisis, Am. Heart Ass'n, http://www.heart.org/HEARTORG/ Conditions/HighBloodPressure/AboutHigh BloodPressure/ Hypertensive-Cri-sis_UCM_301782_Article.jsp (last updated July 23, 2010). The Association explains:
There is no safe duration for blood pressure to remain in this range. Do not wait to see if your pressure comes down on its own. Call 9-1-1 immediately for emergency medical assistance. If you can't access the emergency medical services ... have someone drive you to the hospital right away.
Id. In Blanco v. Prudential Insurance Co. of America, 606 F.3d 399 (7th Cir.2010), the Seventh Circuit noted that the plaintiffs' decedent "had a blood pressure of 210/132,” for which his doctor "recommended that [the decedent] be hospitalized because he was in a *349 hypertensive crisis,” id. at 403. In a corresponding footnote, the Seventh Circuit cited to external sources to explain that "Normal blood pressure is 90-119/60-79, pre-hypertension is 120-139/80-89, Stage 1 hypertension is 140-159/80-89, and Stage 2 Hypertension is 160+/100 + .” Id. at 403 n. 6 (citing Anthony S. Fauci et al., Harrison’s Principles of Internal Medicine 1553 (17th ed.2008), and the website of the National Heart Lung and Blood Institute). See also Shepherd v. Dallas Cnty., 591 F.3d 445, 449 (5th Cir.2009) (describing the plaintiff’s blood pressure reading of 181/133 as "a level considered a 'hypertensive emergency,' ” and explaining that the plaintiff "experienced a second hypertensive emergency” when his blood pressure was measured at 242/132).

. Specifically, he stated at different places in a report that “there is no record of treatment or physician notification” after the measurement, that Henson’s blood pressure “was not treated or assessed,” and that "no intervention or followup was provided.”

. A plaintiff may make claims and recover damages on behalf of a decedent in a § 1983 action if the relevant state survival statute gives the plaintiff standing to do so:
Standing under the Civil Rights Statutes is guided by 42 U.S.C. § 1988, which provides that state common law is used to fill in the gaps in administration of civil rights suits. Therefore, a party must have standing under the state wrongful death or survival statutes to bring a claim under 42 U.S.C. §§ 1981, 1983, and 1988.
Pluet v. Frasier, 355 F.3d 381, 383 (5th Cir.2004) (citing Rhyne v. Henderson Cnty., 973 F.2d 386, 390-91 (5th Cir.1992)) (citation omitted). Here, Barbara Reed, as daughter of Henson and representative of his estate, asserted a claim for damages, including for Henson's pain, suffering, and mental anguish suffered prior to his death, under the Texas Survival Act, which states in relevant part that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." Tex. Civ. Prac. & Rem.Code § 71.021(b). Thus, Reed has asserted and may claim any damages that Henson would be able to claim, including for his pain and suffering, if he were still alive. See Flores v. Cameron Cnty., Tex., 92 F.3d 258, 272 (5th Cir.1996) (“The actionable wrong in a [Texas] [S]urvival [Act] action is that which the decedent suffered before death. The damages recoverable [by the survivors] are those which the decedent sustained while alive.” (quoting Felan v. Ramos, 857 S.W.2d 113, 118 (Tex.Ct.App.1992) (citations omitted))).